**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Alphonso POLITO, Defendant-Appellee.**

**No. 824, Docket 78–1031.**

United States Court of Appeals,
Second Circuit.

Argued April 11, 1978.

Decided Aug. 15, 1978.

Roger P. Williams, Asst. U. S. Atty., Western District of New York, Buffalo, N. Y. (Richard J. Arcara, U. S. Atty., Western District of New York, Buffalo, N. Y., of counsel), for the United States of America.

Carl H. Dobozin, Buffalo, N. Y. (Dobozin & Pottle, Buffalo, N. Y., of counsel), for defendant-appellee.

Before FRIENDLY, GURFEIN and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

This appeal raises the question whether and in what manner local law enforcement personnel may assist the Parole Commission of the United States Department of Justice in the apprehension of federal parolees for whom the Commission has issued warrants which instruct federal officers to retake and return to custody the named parolee. Alphonso Polito, for whom such a warrant had been issued, was detained by a Buffalo, New York, police officer who had been made aware of the warrant, and he was promptly turned over to appropriate federal officials. Subsequently, an indictment was returned against Polito based upon evidence seized at the time of his detention. At a pre-trial hearing, Judge John T. Elfvin of the United States District Court for the Western District of New York held that the police officer was without authority to make the stop and ordered the evidence suppressed. The government determined that no prosecution would be possible without the evidence and, pursuant to 18 U.S.C. § 3731, filed this appeal. For the reasons that follow, we reverse Judge Elfvin's suppression order and remand for further proceedings.

On March 13, 1972, Alphonso Polito was convicted in the Western District of New York of conspiracy to rob a bank, 18 U.S.C. § 371; he was sentenced under the Youth Corrections Act, 18 U.S.C. §§ 4209, 5010(b), to four to six years imprisonment. Three years later, on March 12, 1975, he was released on parole. In October of 1976, however, William Schaefer, Chief Officer of the Probation Office in Buffalo and Polito's supervisor, asked the Parole Commission to consider Polito a parole violator and issue a warrant for his retaking. Two parole violations were alleged. First, beginning in July, 1976, Polito had failed to submit his monthly supervision reports to his parole officer. Second, as of August, 1976, Polito had left what had been his residence in Buffalo and had failed to report the change. At the time of the warrant application, Polito's whereabouts were unknown. The warrant was issued on November 10, 1976.

Soon after the issuance of the warrant, the Erie County Savings Bank of Buffalo received from the Federal Bureau of Investigation a flier, described as a "wanted poster," regarding Polito. This flier apparently consisted of a photograph of Polito and notification that he was wanted by the federal government for parole violation. According to the chief security guard at the bank, Ray Collins, he and the other bank employees were asked by the FBI to "watch for" Polito. Collins, in fact, kept the photograph of Polito under the plastic cover on the inside of his service hat and looked at it frequently while on duty. Collins was also advised by the FBI that Polito had a safe deposit box in the bank. The FBI flier was also circulated to various members of the Buffalo Police Department.

On the morning of December 27, 1976, Polito walked into the bank. Josephine Burgio, an employee of the bank for 22 years, recognized Polito and telephoned Mr. Lunde of the FBI, telling him that Polito was in the bank. She then informed Collins of Polito's presence and returned to work. During this time, Polito was apparently tending to some business he had in the safe deposit vault area of the bank. Collins in turn notified Patrick McDonald of Polito's presence. McDonald was one of a number of Buffalo police officers who, when off duty, serve as security guards for the shopping mall in which the bank is located; at the time of these events, however, he was

merely waiting for friends in the mall and was not on duty in either capacity. McDonald was aware of the FBI flier on Polito.[1] He instructed an elevator attendant to call other mall security officers for assistance and then proceeded to the bank, carrying his badge and identification in one hand and his gun in the other.

As Polito started to leave the bank, McDonald instructed him to stop, identified himself as a police officer, and ordered him to take his hands out of his pockets. McDonald testified that Polito "started to take his hands out of his pockets and he hesitated and then he took them out completely." McDonald then told Polito that he was under arrest pursuant to a warrant and conducted a "pat down" search. During this search, he felt "two hard objects in [Polito's] front pockets, both left and right pockets." He promptly ushered Polito into a nearby conference room and, in Collins' presence, conducted a more thorough search. During the course of this search, McDonald discovered a loaded .357 magnum pistol and a loaded .32 Llama pistol in the front pockets of an Army field jacket which Polito was wearing underneath a larger green parka. The pockets of the green parka had been cut to allow access to the pockets of the field jacket. McDonald also discovered a portable radio scanner device monitoring the Buffalo police frequency (the ear plug was in Polito's left ear); a tool known as a "dent puller"; lose cartridges; and ten marijuana cigarettes. By the conclusion of the search, which apparently took a little over ten minutes, Undersheriff Thomas Higgins and Officer William Fisher, both of the Buffalo police department, had arrived to assist McDonald. Special agents from the FBI had also responded by that time.

On January 20, 1977, an indictment was filed in the Western District of New York charging Polito with receiving a .357 magnum pistol which had been transported in interstate commerce. 18 U.S.C. §§ 922(h), 924(a). Polito moved for suppression of evidence seized at the time of his apprehension, including the .357 magnum. The district judge, relying on his interpretation of 18 U.S.C. § 4213, the federal statute dealing with parole violator warrants, and the fact that the documents provided by the parties relating to Polito's parole violation warrant were addressed to federal officers, determined that local police officers were not authorized to execute federal parole warrants, that the detention of Polito was therefore unlawful and that, accordingly, evidence seized incident to that detention had to be suppressed. The government appealed.

## DISCUSSION

New York police officers are authorized to arrest for state and federal offenses, N.Y.Crim.Proc. Law § 140.10; *Marsh v. United States,* 29 F.2d 172 (2d Cir. 1928) (L. Hand, J.), to execute federal arrest warrants, *United States v. Bowdach,* 561 F.2d 1160 (5th Cir. 1977); *People v. Floyd,* 56 Misc.2d 373, 288 N.Y.S.2d 950 (Sup.Ct.Queens Co.1968), aff'd, 33 A.D.2d 795, 307 N.Y.S.2d 832 (2d Dep't 1969), rev'd on other grounds, 26 N.Y.2d 558, 312 N.Y. S.2d 193, 260 N.E.2d 815 (1970), *discussed in United States v. Swarovski,* 557 F.2d 40, 46 (2d Cir. 1977), cert. denied, 434 U.S. 1045, 98 S.Ct. 889, 54 L.Ed.2d 796 (1978),[2] and to execute warrants for the retaking of New York State parolees, N.Y.Exec.Law § 259–i(3)(a)(i) and (iii), formerly, N.Y.Correc.Law § 217. Polito argues on this appeal, as he did below, that Officer McDonald exceeded his authority by detaining him and that, accordingly, evidence seized incident to that detention was inadmissible. Here, a federal warrant had been issued for Polito's retak-

---

1. Polito argues on appeal, as he did below, that McDonald had no knowledge of the federal warrant. The district court found that McDonald knew of the warrant and believed that he was acting pursuant to it when he made the stop. We see no basis for disturbing this finding.

2. We note parenthetically that 18 U.S.C. § 3653 authorizes district courts to issue federal bench warrants for the apprehension of probationers who have violated the terms of their probation.

ing and, knowing of the warrant and having been informed that Polito was its subject, McDonald detained him. *See* note 1, *supra,* and note 3, *infra.* Because this is not a case involving a warrantless arrest, the question whether McDonald acted outside his authority under state law is neither before us nor determinative of our deliberations. *See United States v. DiRe,* 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948). *See also* note 8, *infra,* and accompanying text. Thus, we consider here only the question whether some federal statutory or constitutional provision was violated in such a way as to require suppression. *Cf. United States v. Turner,* 558 F.2d 46, 49 (2d Cir. 1977) ("This is a federal prosecution, and federal law determines whether suppression is appropriate.").

The Parole Commission's authority to issue warrants for the retaking of parolees is found in the Parole Commission and Reorganization Act, 18 U.S.C. § 4201 *et seq.* Section 4213 of that Act provides in pertinent part as follows:

(a) If any parolee is alleged to have violated his parole, the Commission may—

. . . . .

(2) issue a warrant and retake the parolee as provided in this section.

. . . . .

(d) Any officer of any Federal penal or correctional institution, or any Federal officer authorized to serve criminal process within the United States, to whom a warrant issued under this section is delivered, shall execute such warrant by taking such parolee and returning him to the custody of the regional commissioner, or to the custody of the Attorney General, if the Commission shall so direct.

The regulations promulgated by the Commission provide that such a warrant may be issued only upon presentation of "satisfactory evidence" that a parolee has violated the conditions of his or her release. 28 C.F.R. § 2.44(a).[3] The regulations regarding execution of such warrants by federal officers parallel the wording of the statute. 28 C.F.R. § 2.46.[4]

The statute itself is devoid of any suggestion that federal officers must act alone or that local law enforcement officers are prohibited from assisting in the retaking of federal parolees once a warrant has been issued. It provides only that a federal officer "to whom a warrant issued under this section is delivered, shall execute such warrant by taking such parolee and returning him to the custody of the regional commissioner, or . . . the Attorney General . . . ." The legislative history is similarly barren of indications that only federal officers may participate in the retaking of federal parolees for whom warrants are issued. *See e. g.,* H.R.Rep.No.94–184, 94th Cong., 1st Sess. (1975); S.Rep.No.94–369, 94th Cong., 1st Sess. (1975), *reprinted in* [1976] U.S.Code Cong. & Admin.News, p.

---

**3.** We are not confronted with the question whether there existed "satisfactory evidence" to support the issuance of a warrant for Polito's retaking, and there can be no doubt that such a warrant had actually been issued. Polito argued at the pre-trial hearing that no warrant had in fact issued. The government did not provide to the district court the actual warrant for Polito's retaking. Rather, it presented two forms indicating that such a warrant had been both applied for and issued. Parole Form H–24 was described as a "notification" to the United States Marshal in Buffalo that a warrant had been issued for Polito and instructing the Marshal to assume custody. Parole Form H–20 was described as a "warrant application"; it specifies the charges against Polito and also indicates that a warrant had issued. Based on these documents, the district court found that the warrant had issued. The

record on appeal includes these same forms; we, too, are satisfied that the warrant had issued.

**4.** The regulation reads in part as follows:

(a) Any officer of any Federal correctional institution or any Federal officer authorized to serve criminal process within the United States, to whom a warrant is delivered, shall execute such warrant by taking the prisoner and returning him to the custody of the Attorney General.

(b) On arrest of the parolee the officer executing the warrant shall deliver to him a copy of the Warrant Application listing the charges against the parolee, the applicable procedural rights under the Commission's regulations and the possible actions which may be taken by the Commission.

335; H.Conf.Rep.No.94–838, 94th Cong., 2nd Sess. (1976), *reprinted in* [1976] U.S. Code Cong. & Admin.News, p. 351; S.Conf. Rep.No.94–648, 94th Cong., 2nd Sess. (1976); 121 Cong.Rec. 15700–16 (1975); 121 Cong. Rec. 28829–33 (1975); 122 Cong.Rec. S2572–73 (daily ed. Mar. 2, 1976); 122 Cong.Rec. H1499–502 (daily ed. Mar. 3, 1976). The documents supplied by the parties are, likewise, unhelpful in this regard. The warrant application (Parole Form H–20) makes no mention of the personnel authorized to participate in the retaking. The notification to the United States Marshal of the issuance of the Polito warrant (Parole Form H–24) instructs the Marshal as follows:

Dear Sir:

Enclosed are copies of Warrant Application and Warrant in duplicate, issued by the United States Parole Commission for the above-named prisoner [Polito].

(1) Please assume custody if located. If apprehended by and in custody of local authorities, place a detainer.

(2) If the prisoner is sentenced on a new Federal charge, return the warrant unexecuted. . . .

In ambiguous fashion, the notification also instructs the probation officer to "[s]tate known persons and places which will aid in apprehension." Finally, the sample that we have obtained of an actual warrant (Parole Form H–21) is addressed, "To Any Federal Officer Authorized To Serve Criminal Process Within the United States," and commands: "execute this warrant by taking the above-named, wherever found in the United States, and hold him in your custody until he has been afforded a preliminary interview with a person designated by the

Parole Commission, and until authorized to transport him as ordered."

We do not interpret the statute or the various official forms to exclude local law enforcement officers from participating in the retaking of federal parolees for whom warrants have been issued. The statutory instruction that federal officers, or at least the federal officer to whom the warrant is "delivered," "shall execute" such warrants does not mean that federal officers are the only law enforcement officers who may, to use the phrase of Parole Form H–24, "aid in apprehension." Local law enforcement officers can play a vital role in the often difficult task of finding and apprehending federal parole violators. We would be loath to infer that Congress, in directing that a federal officer "shall execute" a parole warrant, intended to deprive federal parole authorities of this valuable local assistance. For us to construe the statute in such a manner would serve only to discourage proper and important cooperation, and this we decline to do.[5] *Cf. United States v. Gordon,* 540 F.2d 452, 453 (9th Cir. 1976); *United States v. Consuelo-Gonzalez,* 521 F.2d 259, 267 (9th Cir. 1975) (*en banc*); *id.* at 271 (Wright, *J.,* dissenting); *United States ex rel. Santos v. New York State Board of Parole,* 441 F.2d 1216, 1218 (2d Cir. 1971), *cert. denied,* 404 U.S. 1025, 92 S.Ct. 692, 30 L.Ed.2d 676 (1972); *United States ex rel. Sperling v. Fitzpatrick,* 426 F.2d 1161, 1165 (2d Cir. 1970) (Lumbard, *J.,* concurring).[6]

Our conclusion that § 4213 does not prohibit local law enforcement officers from assisting in the retaking of federal

**5.** Where, as here, the very reason for the issuance of a federal parole violation warrant rather than a summons is the Commission's lack of information as to the whereabouts of one of its parolees, and where the FBI circulates fliers to local police departments and businesses to the effect that a parolee is being sought under a warrant and asks for their assistance, the type of cooperation evidenced in this case seems particularly appropriate.

**6.** As explained in the cited cases, were this a situation in which the Buffalo police had "used" the fact that Polito was a parolee, or the

fact that a warrant had been issued for his retaking, as a subterfuge for their own criminal investigations, our decision in this case might be entirely different. The Ninth Circuit has said, however, that "[t]he fact that crimes are detected during the administration of the parole system does not convert what is essentially a supervisory and regulatory program into a subterfuge for criminal investigations." *Latta v. Fitzharris,* 521 F.2d 246, 249 (9th Cir. 1975). With this we quite agree. *See also Abel v. United States,* 362 U.S. 217, 226–27, 239–40, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960).

parolees for whom warrants have been issued does not, of course, resolve the question whether it is constitutional for them to do so. It is to this question that we now turn.

Parole is not freedom. A parolee is a convicted criminal who has been sentenced to a term of imprisonment and who has been allowed to serve a portion of that term outside prison walls. By statute, a parolee is "in the legal custody and under the control of the Attorney General." 18 U.S.C. § 4210(a). In 1923, the Supreme Court explained the status of the parolee in the following manner: "While on parole the convict is bound to remain in the legal custody and under the control of the warden until the expiration of the term, less allowance, if any, for good conduct. While this is an amelioration of punishment, it is in legal effect imprisonment." *Anderson v. Corall,* 263 U.S. 193, 196, 44 S.Ct. 43, 44, 68 L.Ed. 247 (1923). Forty years later, the Court held that a parolee was in "custody" within the meaning of the habeas corpus statute, noting that "[w]hile petitioner's parole releases him from immediate physical imprisonment, it imposes conditions which significantly confine and restrain his freedom . . . ." *Jones v. Cunningham,* 371 U.S. 236, 243, 83 S.Ct. 373, 377, 9 L.Ed.2d 285 (1963). More recently, the Court has described parole as "an established variation on imprisonment of convicted criminals." *Morrissey v. Brewer,* 408 U.S. 471, 477, 92 S.Ct. 2593, 2598, 33 L.Ed.2d 484 (1972). The Court has also made clear that a parolee does not enjoy "the absolute liberty to which every citizen is entitled, but only [a] conditional liberty properly dependent on observance of special parole restrictions." *Id.* at 480, 92 S.Ct. at 2600. *See also Moody v. Daggett,* 429 U.S. 78, 85, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976) ("conditional freedom of a parolee").

▮ Thus, parolees are assigned to a unique status in our legal system, neither physically imprisoned nor free to move at will. "A paroled prisoner can hardly be regarded as a 'free' man; he has already lost his freedom by due process of law and,

while paroled, he is still a convicted prisoner whose tentatively assumed progress towards rehabilitation is in a sense being 'field tested.'" *Hyser v. Reed,* 115 U.S. App.D.C. 254, 264, 318 F.2d 225, 235 (*en banc*) (Burger, *J.*), *cert. denied,* 375 U.S. 957, 84 S.Ct. 446, 11 L.Ed.2d 315 (1963). This status has prompted much litigation regarding the constitutional rights of parolees in general. *See, e. g., Latta v. Fitzharris,* 521 F.2d 246 (9th Cir. 1975); *United States v. Consuelo-Gonzalez, supra; Berrigan v. Sigler,* 162 U.S.App.D.C. 378, 386, 499 F.2d 514, 522 (1974); *United States ex rel. Santos v. New York State Board of Parole, supra; United States ex rel. Sperling v. Fitzpatrick, supra; United States ex rel. Randazzo v. Follette,* 418 F.2d 1319 (2d Cir. 1969), *cert. denied,* 402 U.S. 984, 91 S.Ct. 1672, 29 L.Ed.2d 150 (1971); *United States v. Hallman,* 365 F.2d 289 (3d Cir. 1966); *Hyser v. Reed, supra; Martin v. United States,* 183 F.2d 436 (4th Cir.), *cert. denied,* 340 U.S. 904, 71 S.Ct. 280, 95 L.Ed. 654 (1950); *Diaz v. Ward,* 437 F.Supp. 678 (S.D. N.Y.1977); *United States v. Lewis,* 274 F.Supp. 184 (S.D.N.Y.1967) (Mansfield, *J.*). In this case we need not define precisely the constitutional protections enjoyed by parolees in general. We observe only that the case law indicates that parolees are neither totally stripped of nor fully invested with constitutional protections. They are different from other citizens and they may, in certain circumstances, possess fewer constitutional rights. This difference in status and protection is based on the fact that parolees have been convicted of a crime and are still serving their sentence while on parole, albeit not within prison walls.

▮ Here we are not presented with circumstances involving an ordinary parolee but a parolee for whom the Commission has issued a warrant authorizing federal agents to retake him and return him to physical custody. In *Anderson v. Corall,* the Supreme Court made the following observation:

[The parolee's] violation of the parole, evidenced by the warden's warrant and

his conviction, sentence to and confinement in the Joliet penitentiary . . . was in legal effect on the same plane as an escape from the custody and control of the warden. His status and rights were analogous to those of an escaped convict.

263 U.S. at 196, 44 S.Ct. at 45. We do not suggest that the mere allegation of a parole violation justifies treating a parolee like an escaped convict. However, that allegation and the resulting issuance of a warrant for retaking do operate to remove a parolee one step farther from the constitutional protection enjoyed by ordinary citizens. Although it may well be true that parolees in general are entitled to the same expectations of privacy as are wholly free citizens in their dealings with law enforcement personnel other than their parole officers,[7] see Latta v. Fitzharris, supra, 521 F.2d at 248; id. at 254 (Hufstedler, J., dissenting), the same cannot be said with regard to parolees who have violated the terms of their parole and for whom warrants have been issued.

As early as 1937, the Fourth Circuit observed that a parolee was, merely by being a parolee, "already under arrest" and that a warrant for retaking a parole violator "was not a warrant for the arrest of one to be charged with and tried for a crime . . . as contemplated in the Fourth Amendment to the Constitution." Jarman v. United States, 92 F.2d 309, 311. The next year, the District of Columbia Circuit joined in that analysis:

> A warrant issued for the retaking of a person under these laws proceeds upon an entirely different premise and serves a different purpose than in the case of a warrant for the arrest of a person charged with the commission of a crime. A released prisoner is not a free man. Prior to the expiration of his maximum term he is a ward of the Parole Board, subject to its control and care. The Supreme Court has characterized the violation of a condition of parole as being, in

legal effect, on the same plane as an escape from the custody of the warden. . . . Consequently, it cannot be said that the retaking of a prisoner who is already within the legal custody of the authorities constitutes an arrest within the meaning of the constitutional provisions.

Story v. Rives, 68 App.D.C. 325, 331, 97 F.2d 182, 188, cert. denied, 305 U.S. 595, 59 S.Ct. 71, 83 L.Ed. 377 (1938) (citations omitted). The Fourth Circuit reaffirmed the Jarman analysis in 1939:

> [A] warrant issued by the Parole Board for the arrest of a paroled prisoner is not to be judged by the same standards as a warrant for the arrest of one merely charged with crime or a warrant for the search and seizure of property. The prisoner's guilt of crime has already been adjudged, sentence of imprisonment has been imposed upon him, and the purpose of the warrant is merely to restore him to custody and "to advise him of the purpose of his reincarceration."

United States ex rel. Nicholson v. Dillard, 102 F.2d 94, 96, quoting Jarman v. United States, supra, 92 F.2d at 311. More recently, the District of Columbia Circuit has also reaffirmed this analysis. Hyser v. Reed, supra, 115 U.S.App.D.C. at 272 n.15, 273, 318 F.2d at 243 n.15, 244. Courts in this Circuit have agreed. See United States ex rel. Randazzo v. Follette, 282 F.Supp. 10, 14 (S.D.N.Y.1968), aff'd, 418 F.2d 1319 (2d Cir. 1969), cert. denied, 402 U.S. 984, 91 S.Ct. 1672, 29 L.Ed.2d 150 (1971) (" 'The parolee, although physically outside the walls, is still a prisoner; his apprehension, although outwardly resembling arrest, is simply a return to physical custody. . . . To weigh retaking of a parole[e] on scales calibrated for standard cases of arrest and probable cause is to compare incomparables.' "); United States v. Jackson, 22 F.R.D. 38, 41 (S.D.N.Y.1958). We find the reasoning of these cases persuasive and hold that Officer

---

7. We note that ordinarily the names of parolees under federal supervision are not furnished to local police departments. See 28 C.F.R. § 2.37.

McDonald's detention of Polito was not an "arrest" for Fourth Amendment purposes.[8]

Accordingly, because of the unique status of parolees in our society and in our legal system, the peculiar nature of apprehension of parolees under warrants for retaking, and the obvious need for the type of cooperation among federal and local officials that is found in this case, we hold that where a warrant for retaking a parolee has been issued by the Commission and remains outstanding, and where local law enforcement officers have probable cause to believe that an individual is the person being sought, those officers may detain that person for the time necessary to contact federal officials and effect the transfer of that person into federal custody so that the warrant may be properly executed.

Finally, we hold that Officer McDonald's search of Polito and his discovery of the .357 magnum pistol that led to the federal indictment were lawful[9] and, accordingly, that the pistol was admissible evidence. Although the Supreme Court ex-plained in *Terry v. Ohio,* 392 U.S. 1, 24–25, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889 (1968), that "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience," the *Terry* Court went on to hold that:

> [T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. . . . And in determining whether the officer acted reasonably in

---

8. It is for this reason that we do not follow the analytical path suggested by the government on this appeal, *i. e.,* that McDonald's seizure of Polito was a warrantless arrest authorized under New York law. *See United States v. DiRe,* 332 U.S. 581, 591–92, 68 S.Ct. 222, 92 L.Ed. 210 (1948). Section 140.10(1) of New York's Criminal Procedure Law provides as follows:

> Subject to the provisions of subdivision two, a police officer may arrest a person for:
> (a) Any offense when he has reasonable cause to believe that such person has committed such offense in his presence; and
> (b) A crime when he has reasonable cause to believe that such person has committed such crime, whether in his presence or otherwise.

Section 140.50 provides as follows:

> (1) In addition to the authority provided by this article for making an arrest without a warrant, a police officer may stop a person in a public place located within the geographical area of such officer's employment when he reasonably suspects that such person is committing, has committed or is about to commit either (a) a felony or (b) a misdemeanor defined in the penal law, and may demand of him his name, address and an explanation of his conduct.
>     . . . . .
> (3) When upon stopping a person under circumstances prescribed in subdivisions one and two a police officer or court officer, as the case may be, reasonably suspects that he

is in danger of physical injury, he may search such person for a deadly weapon or any instrument, article or substance readily capable of causing serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons. If he finds such a weapon or instrument, or any other property possession of which he reasonably believes may constitute the commission of a crime, he may take it and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person.

Although there appears to be authority for the proposition that violation of the terms of parole is itself an "offense," *see Moorehead v. Hunter,* 198 F.2d 52, 54 (10th Cir. 1952), we think the better view is to the contrary. *See United States v. Hallman, supra,* 365 F.2d at 291; *Hyser v. Reed, supra,* 115 U.S.App.D.C. at 287, 318 F.2d at 258 (Fahy, *J.,* concurring).

9. At the pre-trial hearing, Polito's attorney recognized that local police officers may have authority to "detain" parolees for whom warrants have been issued, but argued that such officers should not have authority to arrest and search those parolees. We cannot recognize a police officer's right to detain without at the same time recognizing the right to conduct a reasonable search in order to protect his safety and the safety of others.

such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

392 U.S. at 27, 88 S.Ct. at 1883 (citations and footnote omitted). The scope of the search allowed in *Terry* was defined as follows:

[I]t must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something less than a "full" search, even though it remains a serious intrusion.

.    .    .    .    .

The sole justification of the search . . . is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.

392 U.S. at 26, 29, 88 S.Ct. at 1882, 1884. In *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), the Court expressly authorized full searches incident to lawful "custodial arrests." The Court explained as follows:

It is scarcely open to doubt that the danger to an officer is far greater in the case of the extended exposure which follows the taking of a suspect into custody and transporting him to the police station than in the case of the relatively fleeting contact resulting from the typical *Terry*-type stop. This is an adequate basis for treating all custodial arrests alike for purposes of search justification.

.    .    .    .    .

Since it is the fact of custodial arrest which gives rise to the authority to search, it is of no moment that [the arresting officer] did not indicate any subjective fear of the [arrestee] or that he did not himself suspect that [the arrestee] was armed.

414 U.S. at 234–35, 36, 94 S.Ct. at 476, 477 (footnotes omitted).

*Terry* and *Robinson* are useful benchmarks for determining the lawfulness of McDonald's search of Polito. Parolees are no doubt jealous of the limited freedom that they enjoy under ordinary circumstances. An encounter between a suspected parole violator and a police officer exercising authority to detain that parolee has at least as great a potential for violence, and presents at least as great a danger to the police officer and bystanders, as was found to exist incident to *Robinson*-type arrests. Accordingly, where a warrant has been issued for retaking a parolee, and where local law enforcement officers detain a person pursuant to that warrant and in the manner prescribed above, those officers may search the person in a reasonable manner. At least for purposes of defining the scope of the search to be allowed in such circumstances, the apprehension of a parolee is quite properly denominated a "custodial arrest" and evidence seized during the course of such a search is admissible.

This is a unique case and, as noted by the Third Circuit in *United States v. Hallman, supra,* 365 F.2d at 292, "each case depends upon its peculiar facts for resolution" and no case should be "understood to rule so as to prohibit proper cooperation and assistance of law enforcement and administrative officers among themselves." We are, of course, aware of the Supreme Court's instruction that "[t]he deliberate use by the Government of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the courts." *Abel v. United States,* 362 U.S. 217, 226, 80 S.Ct. 683, 690, 4 L.Ed.2d 668 (1961). But we find no bad faith here, either on the part of Officer McDonald, when he acted to assist in the apprehension of Polito, or on the part of the United States Government, when it decided to prosecute Polito on the basis of the .357 magnum pistol found in Polito's possession. In *Elkins v. United States,* 364 U.S. 206, 221, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), the Supreme Court explained that, in order for our country to enjoy a "healthy federal-

ism," it is necessary that "[f]ree and open cooperation between state and federal law enforcement officers . . . be commended and encouraged." It is in that spirit, and with the expectation that "forthright cooperation under constitutional standards will be promoted and fostered" by our decision today, *id.* at 222, 80 S.Ct. at 1446, that we reverse the decision of the district court and remand for further proceedings.