UNITED STATES of America, Appellee,

v.

James THOMAS, Defendant-Appellant.

No. 394, Docket 83–1246.

United States Court of Appeals,
Second Circuit.

Argued Nov. 15, 1983.

Decided Feb. 22, 1984.

Phylis Skloot Bamberger, The Legal Aid Society, Federal Defender Services Unit, New York City, for defendant-appellant.

Michael R. Bromwich, Asst. U.S. Atty., S.D.N.Y., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Barry A. Bohrer, Asst. U.S. Atty., S.D.N.Y., New York City, of counsel), for appellee.

Before OAKES, MESKILL and PIERCE, Circuit Judges.

MESKILL, Circuit Judge:

Appellant James Thomas appeals from a judgment of the United States District Court for the Southern District of New York, Metzner, J., convicting him of two counts of illegal possession of United States Treasury checks. Thomas moved below to suppress the checks, contending that they were seized during an illegal search by his parole officer. When the district court denied the suppression motion, Thomas pleaded guilty to both counts while preserving his right to appeal the adverse decision on his suppression motion.

After Thomas served a state prison term in Pennsylvania for armed robbery, his parole supervision was transferred to New York under the Interstate Compact, N.Y. Exec.Law § 259–m (McKinney 1982) (adopted pursuant to 4 U.S.C. § 112 (1982)). Officer Rooney was assigned to supervise Thomas' parole in November 1982. On April 7, 1983 Thomas reported to Rooney's office for his regularly scheduled meeting and inquired about the termination of the parole. Officer Rooney procured Thomas' file and after noting that the parole terminated in 1989, observed that Thomas had been convicted of narcotics possession in 1968. Rooney, who previously was unaware of the conviction, asked Thomas if he was still using drugs. When Thomas replied in the negative Rooney asked him to remove his jacket and roll up his shirt sleeves. Thomas complied, stating: "I knew you were going to do that."

Rooney examined Thomas' left arm and discovered several puncture marks. Thomas explained that he received the puncture marks during a blood test at a welfare office. Concluding that Thomas was using narcotics, Rooney instructed Thomas to stand up and face the wall. Rooney then searched Thomas, patting him down and searching his trouser pockets. Thomas again sat down. Rooney picked up Thomas' jacket, opened the front pocket and removed a needle, a syringe, a plunger and cigarette rolling paper. Upon examining another jacket pocket, Rooney discovered an unsealed envelope with the flap tucked inside. Rooney opened the envelope and found eleven United States Treasury checks. Thomas explained that he had found the checks. Rooney then called the Postal Inspectors and the Secret Service. Based on the evidence he found, Rooney obtained an arrest warrant from his supervisor and placed Thomas under arrest for parole violation.

Thomas based his suppression motion on our decision in *United States v. Rea*, 678 F.2d 382 (2d Cir.1982), where we excluded

evidence seized by federal probation officers in a warrantless search of a probationer's apartment and held that a warrant is required unless "the search falls within a judicially recognized exception to the warrant requirement." *Id.* at 388. The district court instead relied on our decision in *United States ex rel. Santos v. New York State Board of Parole*, 441 F.2d 1216 (2d Cir.1971), *cert. denied*, 404 U.S. 1025, 92 S.Ct. 692, 30 L.Ed.2d 676 (1972), and denied Thomas' motion. In *Santos*, we held that a state parole officer could search a parolee's apartment without a warrant. The court distinguished *Santos* and *Rea* by noting that *Santos* involved a state parole officer and that *Rea* dealt with a federal probation officer. The district court alluded to our discussion in *Santos* of a New York State parole officer's statutory responsibility to ensure that the conditions of parole are not being violated and of how that responsibility requires that a parole officer be empowered to conduct searches of parolees that would violate the rights of ordinary citizens. The court concluded that *Santos* interpreted N.Y. Correction Law § 210 (McKinney 1968), which sets forth the duties of parole officers, as permitting a warrantless search. Noting that the present case involved a New York State parole officer, the district court found that *Santos* controlled and that the warrantless search of Thomas was proper because the narcotics conviction provided reasonable grounds for the parole officer's investigation.

On appeal, Thomas claims that the parole officer's search was illegal because the parole officer lacked both probable cause and a search warrant. We believe that neither *Santos* nor *Rea* controls the outcome here.[1]

Nevertheless, we agree with the district court's conclusion that the checks were admissible and we affirm the judgment of conviction.

Ordinarily, the "seizure of personal property [is] *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause." *United States v. Place*, —— U.S. ——, ——, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983). But Fourth Amendment protections extend only to "unreasonable government intrusions into … legitimate expectations of privacy." *United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977). The focus of our inquiry into whether Officer Rooney's search violated Thomas' Fourth Amendment rights thus becomes whether Thomas had a legitimate expectation of privacy for his person and clothing at the time of the search and whether, in light of that expectation, Rooney's actions were unreasonably intrusive.

The test for determining when an expectation of privacy is reasonable or legitimate was stated explicitly in Justice Harlan's often cited concurring opinion in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967): "[T]here is a two-fold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Id.* at 361, 88 S.Ct. at 516 (Harlan, J., concurring).

■ Thomas can satisfy neither prong of this test. First, it is obvious that he did not in fact have an expectation that his person or clothing would not be searched while he was in Rooney's office. A New

---

**1.** Both *Santos* and *Rea* deal with the search of residences rather than the search of a parolee while he is in his parole officer's office. *Rea,* on which appellant relies, is further factually distinguishable. In *Rea,* four probation officers searched the home of a probationer and his common law wife over their objections and four days after receiving an anonymous tip that the probationer was engaged in criminal conduct.

The New York state cases cited in the dissent are also not dispositive. *People v. Huntley,* 43

N.Y.2d 175, 371 N.E.2d 794, 401 N.Y.S.2d 31 (1977), concerns the search of a parolee's residence by parole officers. In *People v. Jackson,* 46 N.Y.2d 171, 385 N.E.2d 621, 412 N.Y.S.2d 884 (1978), the probation officers' search was of a probationer's locker, in which the officers discovered car keys, and a subsequent search of the probationer's car. As in the *Huntley* case, the officers had delayed their search for several hours after receiving an anonymous tip.

York parolee is required to sign a statement that he understands the conditions of his release. 9 N.Y.C.R.R. § 8003.1(c) (1978). Thomas, as a transferee from the Pennsylvania parole system, had not signed such a statement but the conditions were read to him by Officer Rooney at the time of his transfer. The conditions included consent to searches and inspections of his person and property by his parole officer. Transcript of June 16, 1983 at 7, *United States v. Thomas*, No. 83 Cr. 340 (CMM) (S.D.N.Y. June 16, 1983) (testimony of Brian Rooney). Having been alerted to the conditions of parole, Thomas would not have the expectation of privacy enjoyed by ordinary citizens. Furthermore, Thomas manifested his diminished subjective expectation of privacy by saying, "I knew you were going to do that," when Officer Rooney told him to roll up his shirt sleeves.

■ Second, because Thomas was a parolee his legally cognizable expectation that his person or clothing would not be searched while he was in Rooney's office was substantially reduced. The status of parolees in our legal system is unique; they are "neither physically imprisoned nor free to move at will." *United States v. Polito*, 583 F.2d 48, 54 (2d Cir.1978). A parolee does not enjoy "the absolute liberty to which every citizen is entitled, but only [a] conditional liberty properly dependent on observance of special parole restrictions." *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Because of this unique position, a parolee "possess[es] fewer constitutional rights" than ordinary citizens, *Polito*, 583 F.2d at 54. The rights diminished by parolee status include Fourth Amendment protections from intrusions by parole officers. *United States v. Bradley*, 571 F.2d 787, 790 (4th Cir.1978); *Latta v. Fitzharris*, 521 F.2d 246, 248–49 (9th Cir.) (en banc), *cert. denied*, 423 U.S. 897, 96 S.Ct. 200, 46 L.Ed.2d 130 (1975); *United States ex rel. Santos v. New York State Board of Parole*, 441 F.2d at 1218; *United States ex rel. Randazzo v. Follette*, 418 F.2d 1319, 1322 n. 7 (2d Cir.1969), *cert. denied*, 402

U.S. 984, 91 S.Ct. 1672, 29 L.Ed.2d 150 (1971).

A parolee's diminished Fourth Amendment protection regarding searches by a parole officer arises from the necessity for effective parole supervision and the unique relationship of the parole officer and the parolee. *United States v. Bradley*, 571 F.2d at 790; *Latta v. Fitzharris*, 521 F.2d at 249. A parolee is in the legal custody of a parole officer who monitors the parolee's adherence to the conditions of his or her parole. N.Y.Exec. Law § 259–i(2)(b) (McKinney 1982). A parole officer's function is twofold: "to guide the parolee into constructive development" and to prevent "behavior that is deemed dangerous to the restoration of the individual into normal society." *Morrissey v. Brewer*, 408 U.S. at 478, 92 S.Ct. at 2598. To ensure that the conditions of parole are not being violated and to monitor the parolee's progress of reintegration into society, a parole officer, of necessity, must have investigative powers to gather information about the parolee's activities, environment and social contacts. *Accord Latta v. Fitzharris*, 521 F.2d at 249. Often such information can only be obtained by activities like searches that invade the privacy of the parolee to an extent that "would be unlawful if directed against an ordinary citizen." *United States ex rel. Santos v. New York State Board of Parole*, 441 F.2d at 1218.

■ Expectations of privacy can vary, depending on circumstances and location. *E.g.*, *United States v. Knotts*, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) (travel route on public street); *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (automobile); *United States v. Lyons*, 706 F.2d 321 (D.C.Cir.1983) (hotel room); *United States v. Kaiyo Maru No. 53*, 699 F.2d 989 (9th Cir.1983) (commercial property); *United States v. MacPherson*, 664 F.2d 69 (11th Cir.1981) (border search); *United States v. Huie*, 593 F.2d 14 (5th Cir.1979) (mail cover). A parolee's diminished expectation of privacy would necessarily be further diminished while he is in his parole officer's

office. Even an ordinary citizen's expectation of privacy is less in a public office than in a residence. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976) (sanctity of private dwelling ordinarily afforded most stringent Fourth Amendment protection); *Harris v. United States*, 331 U.S. 145, 151 n. 15, 67 S.Ct. 1098, 1102 n. 15, 91 L.Ed. 1399 (1947) (stricter requirements for dwelling searches). The expectation of privacy of a parolee in a parole officer's office would be at its lowest ebb. *See M.M. v. Anker*, 607 F.2d 588 (2d Cir.1979) (per curiam) (teachers' unique relationship to students including discipline, education and protection justifies limited search on less than probable cause on school premises).

In light of Thomas' diminished expectation of privacy, the limited initial intrusion into his privacy, the request that he roll up his sleeves and the examination of his forearms, was not unreasonable. Once Rooney discovered Thomas' previous drug conviction, it was his duty as a parole officer to investigate further to determine whether Thomas was being rehabilitated or was violating the conditions of his parole. The risk that a former narcotics user will "resume this habit while on parole [is] sufficiently great to justify periodic inspections of his arms for narcotic injection marks." White, The Fourth Amendment Rights of Parolees and Probationers, 31 U.Pitt.L.Rev. 167, 192 (1969). *See Illinois v. Lafayette*, —— U.S. ——, 103 S.Ct. 2605, 2609, 77 L.Ed.2d 65 (1983) (search justified if "legitimate governmental interests" outweigh individual's privacy interests).

We need not determine on this appeal the acceptable Fourth Amendment limits on a parole officer's intrusion into a parolee's privacy. It is enough to state that Rooney's examination of Thomas' forearms was clearly within whatever limits we would set. Neither was Officer Rooney's further examination of appellant's person and clothing after his discovery of fresh needle punctures on appellant's forearm an unreasonable search. Observation of the puncture marks provided the parole officer with reasonable grounds to believe that Thomas was violating the condition of his parole prohibiting the use or possession of a controlled substance or drug paraphernalia. Given Thomas' diminished expectation of privacy and Officer Rooney's need to fulfill his parole supervision function, the puncture marks justified further investigation of Thomas' clothing. To require a parole officer who has reasonable grounds to believe that the parolee present in his office is violating the terms of parole to obtain a search or an arrest warrant before searching a parolee, and risk the destruction of evidence of the violation, would be absurd.

The judgment of conviction is affirmed.

OAKES, Circuit Judge (dissenting):

Since I begin analysis of this case with some premises which differ from those of the majority, it is not surprising that I reach some different conclusions. I think we agree that the Fourth Amendment applies to parole searches and that older authorities excluding parolees from the Fourth Amendment's protection against unreasonable searches and seizures are, as Judge Hufstedler put it in *Latta v. Fitzharris*, 521 F.2d 246, 254 (9th Cir.) (en banc) (dissenting opinion), *cert. denied*, 423 U.S. 897 (1975), "constitutionally defunct." *Compare United States v. Rea*, 678 F.2d 382, 386–87 (2d Cir.1982), *with United States ex rel. Santos v. New York State Board of Parole*, 441 F.2d 1216 (2d Cir. 1971), *cert. denied*, 404 U.S. 1025, 92 S.Ct. 692, 30 L.Ed.2d 676 (1972). We apparently also agree that a parolee has a legitimate "expectation of privacy," however question-begging that catch phrase from Justice Harlan's concurring opinion in *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967), may be. *See* Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn.L.Rev. 349, 385 (1974). In addition, we may be agreed that the parolee's "expectation" is not the same as that of other citizens who are not enmeshed in the parole system, at least insofar as the relationship between the parolee and his parole officer is concerned.

Finally, we apparently agree that this search was not conducted with Thomas's consent. *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), makes it evident that there was no consent here.

I fear we disagree, however, on the following points: (1) whether something less than probable cause justifies a warrantless search of the body and effects of the parolee by his parole officer; (2) the extent to which we should look at state law governing the conduct of a state parole officer to determine whether the officer's actions were reasonable; (3) whether a fifteen-year-old conviction for a narcotics misdemeanor, in and of itself, furnished probable cause for asking the parolee to remove his jacket and roll up his shirtsleeves; and (4) whether Thomas's "subjective" expectation has any bearing.

The relevance of Thomas's subjective expectations of privacy is, to my mind, the most clearcut of the issues dividing us. I agree with Professor Amsterdam that subjective expectations obviously have "no place in a statement of what *Katz* held or in a theory of what the fourth amendment protects." 58 U.Minn.L.Rev. at 384. If subjective expectations played a role in the scope of the Fourth Amendment's protections, the Government could diminish each person's expectation merely by regularly announcing through the media that we were all being placed under comprehensive electronic surveillance. Clearly, such a result would not be compatible with the fundamental tenet that the Constitution limits our government, not vice versa.

As to the first point of our disagreement, I believe that this court's decision in *United States v. Rea,* 678 F.2d 382, should be determinative here. In *Rea,* the court was "squarely presented with the question of whether a person's status as a probationer creates an exception to the rule that searches other than those conducted under specific exceptional conditions must be au-

thorized by a previously issued search warrant." The unanimous panel answered the question negatively. 678 F.2d at 387–88. Granting that *Rea* involved the search of a probationer's house, the basic principle, that one's status as a probationer or a parolee [1] does not provide an exception to general Fourth Amendment rules, is directly applicable here. Thus, absent one of the specific exceptions from the warrant requirement, such as seizure of contraband or evidence in plain view, *Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971), voluntary consent of the individual searched, *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 859 (1973), a search incident to a lawful arrest, *United States v. Robinson,* 414 U.S. 218, 224, 94 S.Ct. 467, 471, 38 L.Ed.2d 427 (1973), searches reasonably necessary to protect the safety of the law enforcement officer, *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968), or searches conducted under certain other exigent circumstances, *e.g., United States v. Martino,* 664 F.2d 860, 878 (2d Cir.1981) (Oakes, J., concurring), *cert. denied sub nom. Miller v. United States,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982), no search may be made—even of a parolee by his parole officer—without probable cause.

I concede that in the case of a parolee, the test for probable cause is not necessarily the same as it is in the case of a citizen neither on probation nor on parole. By definition a parolee has committed a crime, and as a result the State has set certain conditions upon his maintaining freedom. Those conditions summon up considerations of probability and causation which may very well not be involved with the ordinary law-abiding citizen.

In the case of a state parole officer and a state parolee, I think that we must refer to state law to determine whether the parole officer had probable cause to conduct a

---

**1.** In general, courts have treated parolees and probationers alike in the Fourth Amendment context. *E.g., People v. Jackson,* 46 N.Y.2d 171, 174, 385 N.E.2d 621, 623, 412 N.Y.S.2d 884, 886 (1978); *United States v. Consuelo-Gonzalez,* 521 F.2d 259, 265 (9th Cir.1975).

search. It is precisely at this point, it seems to me, that the majority opinion is deficient, even though it makes a reference or two *en passant* to the New York State parole law, noting in particular that a parolee is in custody under New York Executive Law § 259–i(2)(b) (McKinney 1982). There is a body of New York law on this question consisting of recent decisions by the highest court of the state applicable to parolees and probationers. Application of that law here, I believe, is appropriate and would result in reversal of the appellant's conviction.

In *People v. Huntley*, 43 N.Y.2d 175, 371 N.E.2d 794, 401 N.Y.S.2d 31 (1977), the New York Court of Appeals held that a parolee does not surrender his constitutional rights against unreasonable searches and seizures.[2] 43 N.Y.2d at 180–81, 371 N.E.2d at 796, 401 N.Y.S.2d at 34. Although *Huntley* seems to call for a showing of something less than probable cause to justify a warrantless search, thus facially supporting the majority's view, the court ultimately embraced a flexible analysis of "probability" and "cause" such as I urge be adopted here. The *Huntley* court held that the question "must turn on whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty . . . in the particular circumstances." 43 N.Y.2d at 181, 371 N.E.2d at 797, 401 N.Y.S.2d at 34. Noting that a parole officer's duties include detecting and preventing parole violations for the protection of the public as well as assisting the parolee to a proper reintegration to his community, the Court of Appeals pointed out that a parole officer nevertheless "does not have a carte blanche . . . to intrude on the private life and affairs of the parolee." 43 N.Y.2d at 182, 371 N.E.2d at 797, 401 N.Y.S.2d at 34.

The court's application of these principles in upholding the search in *Huntley* illuminates significant differences between the facts of the *Huntley* case and those of the case before us. In *Huntley* the parolee had a demonstrated record of unreliability, not true of Thomas in the instant case. Despite an explicit reminder to Huntley of his duty to report to his parole officers, Huntley twice failed so to report, violations of the most fundamental obligation of a parolee, also not true of Thomas. In addition, the parolee in *Huntley* had quit his employment without informing his parole officer, lied about his employment status, and accepted welfare payments, all of which his parole officers had learned. When the officers went to his house and found him there in the early afternoon without a physical disability or other hindrance to his reporting, what otherwise might have been an impermissible search became a permissible one. In short, the search in *Huntley* was rationally and substantially related to the performance of the parole officer's duty, confronted as he was with an unreliable parolee who had failed to report not once, but twice. Thomas's parole officer was not confronted with anything like such behavior.

In *People v. Jackson*, 46 N.Y.2d 171, 385 N.E.2d 621, 412 N.Y.S.2d 884 (1978), the New York Court of Appeals dealt with the warrantless search of a probationer and his car. It applied the same test to a person on probation as to a parolee. Noting that such a person is "constitutionally entitled to protection against unreasonable searches and seizures," the court held that the defendant's status as a parolee or probationer "is relevant in determining the reasonableness of the search." 46 N.Y.2d at 174, 385 N.E.2d at 623, 412 N.Y.S.2d at 886. It then applied the standard enunciated in *Huntley*, viz., "whether the search is consistent with the duty to supervise adherence to the conditions of probation or parole and the duty to influence the offender to refrain from unlawful conduct." 46 N.Y.2d at 175, 385 N.E.2d at 623, 412 N.Y. S.2d at 887 (quoting Preiser, Practice Commentary, N.Y.Crim.Proc.Law § 410.50 (McKinney 1971).

---

**2.** The court did, however, distinguish between a parolee's own parole officer and a police officer, a point which concededly weighs in the majority's favor here.

Significantly, in *Jackson* there was "no indication that the defendant had proved unreliable" and "no evidence that he failed to report." 46 N.Y.2d at 175, 385 N.E.2d at 624, 412 N.Y.S.2d at 887. There was, however, an anonymous accusation which was to some extent verified. The court held that the searches of the individual, his locker, and his automobile were invalid, reasoning:

> To uphold the search in this case would hardly be consistent with the recognition of a probationer's constitutional right to be free of unreasonable searches and seizures. If that right means anything it must at least mean that a probationer who has not previously violated the conditions of his sentence should not be subjected to a complete search of his person and property whenever his probation officer receives an anonymous phone call.

46 N.Y.2d at 176, 385 N.E.2d at 624, 412 N.Y.S.2d at 887.

In the instant case, Thomas was subjected to three searches: his person was searched when he was required to remove his jacket, roll up his shirtsleeves, and extend his arms; his body was searched subsequently with a pat-down and frisk; and his jacket was searched. The initial examination of his arms was based entirely on the fact that some fifteen years earlier he had been convicted of a misdemeanor for possession of narcotics.[3] The parole officer had encountered no difficulties in supervising Thomas. Indeed, he had extended Thomas's reporting frequency from one to two weeks, and apparently had no suspicion of drug use until he learned of Thomas's conviction fifteen years earlier. In these circumstances, application of the principles of *Huntley* and *Jackson* lead to the conclusion that Thomas's Fourth Amendment rights were violated by the parole officer's initial examination of his

arms. Thomas's parole officer had absolutely no thought that Thomas was not strictly adhering to the conditions which had been established for his parole. Thus, accepting that "probable cause" should be construed more liberally in the parolee context, there were simply no facts in this case upon which probable cause could be based.

Moreover, the initial search in this case does not satisfy the Fifth Circuit's "reasonable suspicion" test, a standard possibly less stringent than the "flexible" probable cause analysis adopted by the New York courts and urged here. *United States v. Scott,* 678 F.2d 32, 35 (5th Cir. 1982); *see also United States v. Bradley,* 571 F.2d 787, 788 n. 1 (4th Cir. 1978) (search of home). As the Fifth Circuit stated:

> Less stringent a standard than probable cause, reasonable suspicion requires no more than that the authority acting be able to point to specific and articulable facts that, taken together with rational inferences from those facts, reasonably warrant a belief in the conclusion mooted—in this instance, that a condition of parole has been or is being violated.

678 F.2d at 35. The fact that the appellant had been convicted fifteen years ago of possession of narcotics, however, is not a fact from which one could rationally infer that he was presently violating a condition of his parole. Thus, even application of the reasonable suspicion standard requires reversal of Thomas's conviction.

The subsequent searches of Thomas's person and then of his jacket, including the envelope therein, were tainted by the first improper search. In addition, however, they were independently unlawful.[4] They cannot be justified as incident to an arrest, *see United States v. Passaro,* 624 F.2d 938, 943–44 (9th Cir. 1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 842 (1981), as none had been made. Nor can they be

---

3. True, Thomas had an employment problem, a difficulty rightfully not mentioned by the majority given that unemployment has affected a substantial number of people.

4. Under the "reasonable suspicion" test adopted by the Fifth Circuit, *United States v. Scott,* 678

F.2d at 35, the latter searches of Thomas's person and jacket would probably have been proper were it not for the fact that the initial search, which led to the discovery of the track marks, was improper.

justified as based on probable cause because of the evidence of a parole violation; the presence of three or four needle marks provided no basis for believing that appellant arrived at the parole office with drugs or drug paraphernalia. Nor could suspicion arise from the mere wearing of a jacket on a day in early spring absent some indication that appellant was nervous about, or possessive of, the jacket. In sum, what we have in this case is an instance of an administrative search which needed a warrant. *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978); *Michigan v. Tyler*, 436 U.S. 499, 504–06, 98 S.Ct. 1942, 1947–48, 56 L.Ed.2d 486 (1978).

Because the searches here were conducted without probable cause and without a warrant, they violated Thomas's Fourth Amendment rights. Accordingly, his conviction should be reversed and the indictment dismissed.