**UNITED STATES of America, Appellee,**

v.

**Edward CARDONA,
Defendant, Appellant.**

**No. 88–1537.**

United States Court of Appeals,
First Circuit.

Heard Jan. 10, 1990.

Decided May 10, 1990.

Francis X. Mackey, Providence, R.I., for defendant, appellant.

Margaret E. Curran, Asst. U.S. Atty., Providence, R.I., with whom Lincoln C. Almond, U.S. Atty., was on brief, for appellee.

Before TORRUELLA and SELYA, Circuit Judges, and BOWNES, Senior Circuit Judge.

SELYA, Circuit Judge.

This case requires us, for the first time, to explore the interstices and margins of the Court's opinion in *Griffin v. Wisconsin,* 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). Having completed this journey into fourth amendment jurisprudence, we hold that a parolee may be arrested in his own home by a police officer not possessing a judicial warrant when the police officer acts in good faith at the request of parole authorities who, in accordance with a parole regulation, have found reasonable cause to order the individual's detention as a suspected parole violator.

I. BACKGROUND

Defendant-appellant Edward Cardona, previously convicted of a felony in New York, was on parole in Rhode Island pursuant to an interstate parole compact. After defendant's Rhode Island parole officer reported problems, a parole violation warrant (PVW) was issued by the New York parole

board. Issuance of the PVW did not require a finding of probable cause, but only a lesser showing, tantamount to reasonable cause, that Cardona had violated the terms of his parole.[1] The PVW's terms authorized any person who could serve process to execute it. N.Y.Exec.Law § 259–i(3)(a)(iii) (1982). Accordingly, the New York authorities forwarded the PVW to their Rhode Island counterparts.

When the PVW arrived in Rhode Island, the Rhode Island parole officer, following routine procedure, solicited the local police to assist in implementing it. The parties agree that the request was made in the ordinary course; in Rhode Island, parole officers are neither armed nor trained to effectuate arrests, and do not typically involve themselves in that activity. Indeed, the standing policy of the state administration is, and has been, that parole officers should not make arrests.

After securing teletype confirmation that the PVW was outstanding, the local police department acted. Unaccompanied by a parole official, three police officers went to Cardona's residence for the sole purpose of executing the PVW. Upon arriving there, they knocked on the front door (which was ajar), announced their presence twice over, and, hearing noises, entered the apartment. The officers found defendant squatting on the floor of a closet; next to him, in plain view, was a sawed-off shotgun. The officers arrested defendant and seized the gun.

A few months later, a federal grand jury in the District of Rhode Island indicted Cardona on two counts arising out of his custody of the weapon. Cardona moved to suppress the evidence. The district court denied the motion. Cardona thereafter pled guilty to being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g), preserving his right to appeal from the denial of the suppression motion. *See* Fed.R.Crim.P. 11(a)(2).

## II. GRIFFIN REDUX

*Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), is our polestar. In an effort to measure its ultimate significance, we first address its essential aspects.

Joseph Griffin was convicted in a Wisconsin state court of resisting arrest, disorderly conduct, and obstructing an officer. He was placed on probation. *Id.* at 870, 107 S.Ct. at 3166. Under Wisconsin law, probation officers are permitted to search probationers' homes without a warrant as long as the officer obtains a supervisor's prior approval and has "reasonable grounds" for a belief that there is contraband on the premises. *Id.* at 870–71, 107 S.Ct. at 3166–67. Well into Griffin's probationary term, a local police detective informed Michael Lew, the supervisor of Griffin's probation officer, that he (the detective) suspected Griffin of secreting guns in his apartment. Unable to obtain the assistance of Griffin's probation officer, Lew went to the apartment with another probation officer and three policemen. *Id.* at 871, 107 S.Ct. at 3167. Although the callers had neither a judicial warrant nor probable cause, their visit complied with an administrative regulation permitting warrantless searches of a probationer's home. *Id.* at 870–71, 107 S.Ct. at 3167–68. When Griffin answered the door, Lew identified the party and informed Griffin that they planned to search his apartment. During the inspection, a handgun was discovered. *Id.* at 871, 107 S.Ct. at 3167.

Griffin was charged with possession of a firearm by a convicted felon (itself a felony). After moving unsuccessfully to suppress the weapon, he was found guilty by a jury. *Id.* at 872, 107 S.Ct. at 3168. On appeal, the Wisconsin Supreme Court upheld the conviction, opining that the "reasonable grounds" standard for probationer searches satisfied the fourth amendment

---

1. The applicable New York statute provides in material part:

   If the parole officer having charge of a paroled or conditionally released person ... shall have reasonable cause to believe that such person has lapsed into criminal ways or company, or has violated one or more conditions of his parole ... a warrant may be issued for the retaking of such person and for his temporary detention in accordance with rules of the [parole] board.

   N.Y.Exec.Law § 259–i(3)(a)(i) (1982).

because of the lesser expectation of privacy enjoyed by a probationer. *State v. Griffin*, 131 Wis.2d 41, 52–64, 388 N.W.2d 535, 539–44 (1986). The Court granted certiorari, 479 U.S. 1005, 107 S.Ct. 643, 93 L.Ed.2d 699 (1986), and thereafter affirmed.

The majority first reviewed the "special needs" exception to the warrant and probable-cause requirements imposed by the fourth amendment on most governmental searches and seizures. Noting that the Court had historically "permitted exceptions [to traditional fourth amendment standards] when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable,'" 483 U.S. at 873, 107 S.Ct. at 3167 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351, 105 S.Ct. 733, 747, 83 L.Ed.2d 720 (1985) (Blackmun, J., concurring)), Justice Scalia concluded that the operation of a state probation system, and particularly the need for close and ongoing supervision of participants, presented just such a "special need." *Id.* 483 U.S. at 875, 107 S.Ct. at 3169. The dichotomous goals to which probation is dedicated—rehabilitation and public safety—coalesced to justify substantial restrictions upon probationers. *Id.* Hence, the special needs of the situation "permitt[ed] a degree of impingement upon privacy that would not be constitutional if applied to the public at large." *Id.*

The Court likened the reduced-liberty status of probationers to that of parolees. *Id.* at 874, 107 S.Ct. at 3168 (citing and quoting *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S.Ct. 2593, 2599, 33 L.Ed.2d 484 (1972)). The Court emphasized that probation, as "a form of criminal sanction," disenfranchises the recipient of at least some rights enjoyed by law-abiding citizens, probation being "simply one point (or, more accurately, one set of points) on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." *Id.* Yet, although the existence of post-conviction monitoring allowed greater trespasses upon privacy than would normally be the case, the "per-

missible degree [of impingement] is not unlimited." *Id.* 483 U.S. at 875, 107 S.Ct. at 3169. The Court proceeded, therefore, to evaluate the extent to which "the special needs of Wisconsin's probation system make the warrant requirement impracticable and justify replacement of the standard of probable cause by 'reasonable grounds.'" *Id.* at 876, 107 S.Ct. at 3170.

The outcome of this evaluation proved to the Court's satisfaction that the situational "needs" were sufficiently "special." Justice Scalia wrote that a warrant and probable-cause requirement would interfere with the proper operation of the probation system, render it "more difficult for probation officials to respond quickly to evidence of misconduct and would reduce the deterrent effect that the possibility of expeditious searches would otherwise create." *Id.* (citation omitted). Throughout, the Court underscored the hybrid role of the probation officer, who, "while assuredly charged with protecting the public interest, is also supposed to have in mind the welfare of the probationer." *Id.* The absence of an unqualifiedly adversarial relationship between probationer and probation officer allowed access to information otherwise unobtainable and served to make the probation officer the best available barometer for gauging the likelihood that the conditions of probation had been transgressed. *Id.* at 878–79 & n. 6, 107 S.Ct. at 3170–71 & n. 6.

Taking all of these factors into account, the Court decided that it was "both unrealistic and destructive of the whole object of the continuing probation relationship to insist upon the same degree of demonstrable reliability of particular items of supporting data, and upon the same degree of certainty of violation, as is required in other contexts." *Id.* at 879, 107 S.Ct. at 3171. On this basis, the Court found the Wisconsin regulation authorizing probation officers to conduct searches of a probationer's home without a judicial warrant and in the absence of exigent circumstances to be constitutionally sound. *Id.* at 880, 107 S.Ct. at 3171.[2]

---

**2.** The affirmance rested on narrower grounds

than those supporting the Wisconsin Supreme

## III. ANALYSIS

The issue before us is largely unclouded by extraneous considerations. It is undisputed that the PVW was validly issued; that New York's "reasonable cause" standard for its issuance was fulfilled and does not differ materially from Wisconsin's "reasonable grounds" criterion; that when the PVW was sworn out there was no "probable cause" for appellant's arrest in the classical sense, see, e.g., O'Connor v. Ortega, 480 U.S. 709, 724, 107 S.Ct. 1492, 1502, 94 L.Ed.2d 714 (1987) (plurality op.) (distinguishing between "probable cause" and "reasonable suspicion"); that there were no "exigent circumstances" justifying entry into the dwelling, see, e.g., United States v. Curzi, 867 F.2d 36, 41–42 (1st Cir.1989) (discussing parameters of doctrine); that just as Wisconsin probationers are deemed held in the state's legal custody, Griffin, 483 U.S. at 870, 107 S.Ct. at 3166, so, too, are New York parolees, see N.Y.Exec.Law § 259–i(2)(b) (1982); that Rhode Island law authorized police officers to arrest Cardona as a suspected parole violator and return him to New York, see R.I.Gen.Laws § 13–8–19 (1981); and that a New York statute also authorized police officers to execute PVWs, see N.Y. Exec.Law § 259–i(3)(a)(iii) (1982). Appellant concedes that the shotgun was in plain view and therefore lawfully seized if the constables' entry into the apartment was valid. See United States v. Rutkowski, 877 F.2d 139, 140–41 (1st Cir.1989) (outlining "plain view" exception to warrant requirement). Last but not least, there is no suggestion that the PVW was trumped up as a subterfuge to permit police to invade appellant's home.

Having cleared away the mist, three potentially significant factual differences separate Griffin from the instant case. First, Griffin involved a probationer whereas this case involved a parolee. Second, the government actors in Griffin entered the dwelling bent on conducting a search; here, the intent was not to search but to detain. And finally, in Griffin the probation officer was physically present at the climactic moment, albeit accompanied by the police. Here, no parole officer was on the scene.[3]

The first of these differences—that Cardona was on parole whereas Griffin was on probation—cuts in favor of the government. Parole is meted out in addition to, not in lieu of, incarceration. It "is an established variation on imprisonment of convicted criminals." Morrissey v. Brewer, 408 U.S. 471, 477, 92 S.Ct. 2593, 2598, 33 L.Ed.2d 484 (1972). Moreover, violation of parole results in a return to jail and the completion of a previously stated sentence. Violation of probation results in the potential imposition of a jail sentence or, in some cases, in the execution of all or some part of a sentence previously imposed but suspended. On the Court's "continuum of possible punishments," Griffin, 483 U.S. at 874, 107 S.Ct. at 3168, parole is the stronger medicine; ergo, parolees enjoy even less of the average citizen's absolute liberty than do probationers. Cf. Faheem–El v. Klincar, 841 F.2d 712, 728 (7th Cir.1988)

Court's decision. Whereas the state court held that any search by a probation officer passes constitutional muster as long as the officer has "reasonable grounds" for opting to search, the Court dealt, more limitedly, with searches conducted pursuant to valid regulations governing probationers. 483 U.S. at 880, 107 S.Ct. at 3171. This limitation, however, has no significant bearing upon the applicability of Griffin to the case at bar. Here, appellant acknowledges that virtually all the salient actions occurred pursuant to state regulations or statutes and after an administrative finding of "reasonable cause" in accordance with New York law. He does not challenge the reasonableness of any component of the regulatory mosaic.

3. We do not think it makes a difference that the incursion in Griffin was effected solely on the strength of a regulation applicable to probationers whereas in this case the entry was backed both by the regulatory scheme and the PVW. In both instances, information was obtained by the monitoring officer, whose recommendation for action was then considered and approved at a higher echelon. The parties do not claim that the standard of administrative review antecedent to the authorizing of further activity (in Griffin, the probation search; here, the parolee's detention) was materially lower in one case than in the other. The mere existence of a slip of paper—the PVW—is in our judgment not enough to disturb the essential equipoise between two fairly comparable situations.

(en banc) (finding rational basis for Illinois procedures affording probationers greater protections than parolees).

The second distinction—lack of an intent to search—leads the dissent to draw what we perceive to be an entirely artificial distinction between "search" jurisprudence and "seizure" jurisprudence. *Post* at 70 – 71. In our view, the distinction possesses no functional relationship to underlying fourth amendment jurisprudence or interests, but serves the solitary purpose of descriptive characterization. That is, the span of possible searches overlaps, almost perfectly, with the span of possible seizures in the extent to which they, respectively, may or may not infringe upon fourth amendment interests. This span ranges from the most minimal intrusion upon a person's privacy to the most violative, without regard to whether the intrusion takes the shape of a search or of a seizure. *See, e.g., United States v. Martinez–Fuerte*, 428 U.S. 543, 565, 96 S.Ct. 3074, 3086, 49 L.Ed.2d 1116 (1976) ("The degree of intrusion upon privacy that may be occasioned by a search of a house hardly can be compared with the minor interference with privacy resulting from the mere stop for questioning as to residence."). Given this categorical interchangeability of searches and seizures in terms of fourth amendment analysis, logic dictates that the conceptual and doctrinal underpinnings applicable to either category be equally applicable to the other category, at least *a priori;* and the Court has approached fourth amendment issues accordingly. *See e.g., id.* at 561, 96 S.Ct. at 3084 (applying balancing framework of *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), to seizure case); *Spinelli v. United States*, 393 U.S. 410, 416–17, 89 S.Ct. 584, 589–90, 21 L.Ed.2d 637 (1969) (describing seizure case, *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), as "suitable benchmark" and "relevant comparison" for determining legality of search); *see also Lopez Lopez v. Aran*, 844 F.2d 898, 902–05 (1st Cir.1988) (applying balancing test of "search" cases to airport stop); 1 W. LaFave, Search and Seizure, § 3.1(b), at 544 (2d ed. 1987) ("It is generally assumed by the Supreme Court and the lower courts that the same quantum of evidence is required whether one is concerned with probable cause to arrest or probable cause to search.") (footnote omitted). If anything, we think entering the home to detain a parolee may well be less intrusive than searching his abode. *Cf. Minnesota v. Olson,* — U.S. ——, ——, 110 S.Ct. 1684, 1685, 109 L.Ed.2d 85 (1990) (purpose of rule that suspect should not be arrested in his home without an arrest warrant "was not to protect the person of the suspect but to protect his home from entry"); *New York v. Harris,* — U.S. ——, ——, 110 S.Ct. 1640, 1641, 109 L.Ed.2d 13 (1990) (similar). Nevertheless, in an effort to hold the balance steady and true, we assign minimal weight to the search/seizure distinction.

By far the most significant factual difference between the cases is the parole officer's absence when the police officers entered appellant's residence. If the parole officer had accompanied the lawmen, we believe that *Griffin* would unarguably apply to defeat appellant's suppression claim. *See Griffin*, 483 U.S. at 879–80, 107 S.Ct. at 3170–71 (approving warrantless search of probationer's home by probation officers with police present); *see also United States ex rel. Randazzo v. Follette*, 418 F.2d 1319, 1322 (2d Cir.1969) (upholding arrest of parolee in parolee's apartment by parole officers lacking a judicial warrant; also validating search incident thereto), *cert. denied*, 402 U.S. 984, 91 S.Ct. 1672, 29 L.Ed.2d 150 (1971). Appellant and our dissenting brother argue strenuously that the parole officer's absence removes the case from *Griffin* 's doctrinal orbit. We agree that this appeal boils down to the constitutional significance of that fact, but we believe for a quadrat of reasons that *Griffin* forecasts the result we must reach.

1. The language of *Griffin* makes it abundantly clear that the Court was concerned about the standards influencing the selection of decisionmakers in particular contexts. The Court's focus was on the degree of security inherent in allowing a

particular decisionmaker, i.e., a probation officer, to make a particular decision, i.e., whether a probationer's home should be searched, based on a particular (relatively modest) level of proof, i.e., "reasonable grounds." *See, e.g., Griffin,* 483 U.S. at 879 n. 6, 107 S.Ct. at 3171 n. 6 ("[o]ur discussion pertains to the reasons generally supporting the proposition that the search decision should be left to the expertise of probation authorities rather than a magistrate"). The Court did not lend any special salience to the identity of the person(s) executing the search, concentrating instead on whether a probation officer may constitutionally authorize a search "support[ed] by a lesser quantum of concrete evidence justifying suspicion than would be required to establish probable cause." *Id.*

The gist of the Court's opinion reduces to the choice between decisionmakers—probation official or judicial magistrate—regarding when, and for what reason(s), a probationer's home may be searched. The Court, concerned about the special needs of the probation system, believed that the Constitution left ample room for the former to call the turn. *See id.* at 876, 107 S.Ct. at 3169 ("A warrant requirement would interfere to an appreciable degree with the probation system, setting up a magistrate rather than the probation officer as the judge of how close a supervision the probationer requires."). Whether the decision, once reached, is realized through police officers, parole officers, or a tag team representing both camps, is peripheral to the Court's holding.

Furthermore, the other differences between this case and *Griffin* favor continued employment of the monitor *qua* decisionmaker. The need for oversight is presumptively greater in connection with parole as opposed to probation. *See, e.g., People v. Burgener,* 41 Cal.3d 505, 532–33, 224 Cal.Rptr. 112, 130–31, 714 P.2d 1251, 1268–69 (1986) (discussing reasons for heightened surveillance and supervision in parole setting). It follows inexorably that the ongoing relationship between parole officer and parolee must be more tightly enmeshed than that between probation officer and probationer. Authorizing an arrest

rather than a general search leaves less to the discretion of the implementing officers. And the issuance of the PVW, if material at all, evidences a considered effort by the parole authorities, in a somewhat more structured fashion than in *Griffin,* to assure that the lowered threshold ("reasonable cause") was crossed.

2. We assume that, as was true in this case, those who implement a PVW will remain faithful to its scope, initiating no independent decisions about further searches or seizures. Put another way, we take as a given that the executors, whoever they may be, will serve merely as agents of the decisionmaker, doing what the decisionmaker authorized, augmented only by the constitutionally permissible (such as seizing recognizable contraband in plain view). As discussed above, we think it is obvious that the *Griffin* Court shared, and proceeded on, this assumption.

We hasten to add that allowing police officers to act in an agentival capacity is not an open invitation to gamesmanship through which law enforcement personnel can circumvent the rigors of the fourth amendment. The law will not allow a parole officer to serve as a cat's paw for the police. *See Latta v. Fitzharris,* 521 F.2d 246, 249 (9th Cir.) (en banc) (plurality op.) (parole search may not be used as a "subterfuge for a criminal investigation"), *cert. denied,* 423 U.S. 897, 96 S.Ct. 200, 46 L.Ed.2d 130 (1975); *Smith v. Rhay,* 419 F.2d 160, 162–63 (9th Cir.1969) (where parole officer conducts warrantless search "not as the supervising guardian, so to speak, of the parolee, but as the agent of the [police]," fruits of search must be suppressed); *cf. United States v. Jarrad,* 754 F.2d 1451, 1454 (9th Cir.) (probation officer may not act as "stalking horse" for police), *cert. denied,* 474 U.S. 830, 106 S.Ct. 96, 88 L.Ed.2d 78 (1985). When and if the integrity of a challenged action is controverted, the dispute is determinable as a question of fact on a case-by-case basis. *See United States v. Richardson,* 849 F.2d 439, 441 (9th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 171, 102 L.Ed.2d 141 (1988). In this case, the question has been asked and de-

finitively answered: Cardona concedes that the police were acting strictly and solely at the parole board's behest. There is no evidence of contrivance. The fact that possible abuses might occur in some other, hypothetical case is insufficient reason to ditch the baby with the bath water.[4]

Given this starting point, logic dictates that in the purlieus of parole the fourth amendment must concern itself more with who authorizes searches and seizures, and the bases on which they are authorized, than with who implements reached decisions. *Cf., e.g., United States v. Ofshe,* 817 F.2d 1508, 1513–14 (11th Cir.) (where search warrant duly issued but executed by federal agents other than person to whom it was directed, defect did not require invalidation of ensuing search), *cert. denied,* 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987); *United States v. Pennington,* 635 F.2d 1387, 1389–90 (10th Cir.1980) (upholding use of fruits where search warrant duly issued by federal magistrate but executed by state officers rather than by federal officer as required by Fed.R.Crim.P. 41(c)), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981). While the actual invasion of privacy does not occur until the search or seizure occurs, the constitutional protection is viable only to the extent that it restricts the authority responsible for making the search or seizure decision, prior to the time the decision crystallizes. As in traditional agency doctrine, the source of the decision to act, not the robotic agent who implements it, is ultimately responsible for the decision's consequences.

In sum, the method of the fourth amendment, and hence the jurisprudential under-

pinnings of *Griffin,* supports the conclusion that police officers and parole officers are fungible when the former serve as mere implementers of decisions already made by the latter. *See Richardson,* 849 F.2d at 442 (decision to authorize search more important than identity of those present during its course);[5] *United States v. Dally,* 606 F.2d 861, 862–63 (9th Cir. 1979) (parole officer may constitutionally authorize valid parole search by corrections official, notwithstanding parole officer's absence during search); *cf. United States v. Polito,* 583 F.2d 48, 56 (2d Cir.1978) (where PVW outstanding, law enforcement officer may detain parolee for purpose of assisting parole authorities).

The force of this postulate is not slowed by appellant's protest that parole officers are more "friendly" or less "adversarial" than police officers. That is so—although to a lesser extent, we think, than is true of probation counsellors. But, the observation is a two-edged blade: it is in part the very lack of unmitigated antagonism that justifies substituting the monitor for the magistrate *qua* decisionmaker. *See Griffin,* 483 U.S. at 878–79, 107 S.Ct. at 3170–71. And as to implementation, it seems fair to suppose that where, as here, the parolee is being arrested preliminary to incarceration for violating parole, the "friendly" nature of the parole officer's visit is considerably diluted. In all candor, we are aware of no "less adversarial" way to capture an individual and place him in custody. To the extent that police officers merely execute a PVW as agents of the parole board, they would seem to be neither more nor less unamiable than the parole officer himself.[6]

---

**4.** If the police stray in a given case—as, indeed, can happen after issuance of a judicial warrant—then ample remediation is available. *See generally United States v. Young,* 877 F.2d 1099, 1105–06 (1st Cir.1989) (discussing choice of remedies for overzealous execution of warrant).

**5.** *Richardson* is apparently at odds with an earlier Ninth Circuit ruling that "searches of probationers not otherwise in compliance with the usual standards of the Fourth Amendment [must] be by, or under the immediate and personal supervision of, probation officers." *United States v. Consuelo–Gonzalez,* 521 F.2d 259,

266 (9th Cir.1975). Because *Richardson,* unlike *Consuelo–Gonzalez,* postdated *Griffin,* we find this tergiversation easily explicable.

**6.** To be sure, the *Griffin* Court took some pains to differentiate between probation officers and police officers. But, we do not view that approach as inconsistent with our assessment. Taken in context, the distinction drawn by the Court relates primarily to the comparative qualifications of classes of officials to serve as decisionmakers, not implementers. *See, e.g., Griffin,* 483 U.S. at 876, 107 S.Ct. at 3169 ("Although a probation officer *is not an impartial magis-*

3. It is by now familiar doctrine that "the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable." *Skinner v. Railway Labor Executives' Ass'n,* — U.S. —, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989). That is to say, "the permissibility of a particular practice 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" *Id.* (quoting *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)); *see also Maryland v. Buie,* — U.S. —, 110 S.Ct. 1093, 1096–97, 108 L.Ed.2d 276 (1990) (ratifying balancing test for fourth amendment purposes); *Brown v. Texas,* 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640–41, 61 L.Ed.2d 357 (1979) (similar); *Lopez Lopez v. Aran,* 844 F.2d at 905 ("judges must weigh the need to search or seize against the invasion the search or seizure entails"). In this respect, a parolee suffers no greater insult to his privacy when three police officers enter his home to do the parole board's bidding than when three police officers and a parole officer enter. The essence of the intrusion is the government's uninvited entrance onto private premises, *cf. Harris,* — U.S. at —, 110 S.Ct. at 1641 ("[t]he warrant requirement for an arrest in the home is imposed to protect the home"), regardless of the entrance's personification; the mere incremental presence of a parole officer does not alleviate the insult.

We agree with our dissenting brother that the sanctity of the home is a highly relevant fourth amendment interest and that "'physical entry into the home is the chief evil against which the wording of the Fourth Amendment is directed'". *Payton v. New York,* 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) (quoting *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972)); *see also United States v. Curzi,* 867 F.2d at 41. We also agree that this interest—which impli-

cates the occupant's right to determine when the government shall or shall not intrude into his private domain—is a powerful one.

We part company with the dissent, however, on two scores. The first lies in our inability to comprehend how, considering the state's "overwhelming interest" in the expeditious retaking of parolees who cannot abide by the terms of their conditional release, *Morrissey,* 408 U.S. at 483, 92 S.Ct. at 2601, a resident's right to privacy is infracted more by a party of three policemen than by a party consisting of those same policemen plus an additional government agent. After all, no less an authority then the Supreme Court has told us straightforwardly that the "special needs" of a state's probation system can justify an intrusion into the home without either a judicial warrant or a demonstration of probable cause. *See Griffin,* 483 U.S. at 873–77, 107 S.Ct. at 3167–69. As we discuss below, the legitimate needs of the parole system are no less demanding. *See People v. Huntley,* 43 N.Y.2d 175, 181, 401 N.Y.S.2d 31, 34, 371 N.E.2d 794, 797 (1977) ("in any evaluation of the reasonableness of a particular search or seizure the fact of defendant's status as a parolee is always relevant and may be critical; what may be unreasonable with respect to an individual who is not on parole may be reasonable with respect to one who is"); *see also United States ex rel. Santos v. New York State Bd. of Parole,* 441 F.2d 1216, 1218 (2d Cir.1971), *cert. denied,* 404 U.S. 1025, 92 S.Ct. 692, 30 L.Ed.2d 676 (1972).

The second point of departure involves the dissent's adamantine insistence that, to paraphrase Gertrude Stein, an arrest is an arrest is an arrest. Like so many words used in the law, "arrest" has a protean quality. Apprehending a parolee—a convicted criminal—as a likely parole violator strikes us as considerably different than detaining a presumptively innocent citizen to face emergent criminal charges. (The cases cited by the dissent, of course, are all

*trate,* neither is he the police officer who normally conducts searches against the ordinary

citizen.") (emphasis supplied).

of the latter stripe, *see post* at 70-72, involving routine felony arrests.) The Court has made it crystal clear that this distinction is a vital one in determining the availability and scope of fourth amendment protection. *See Griffin*, 483 U.S. at 874, 107 S.Ct. at 3168; *Morrissey*, 408 U.S. at 480, 92 S.Ct. at 2599; *cf. Polito*, 583 F.2d at 55–56 (refusing to characterize arrest of parolee as an "arrest" for fourth amendment purposes). Ignoring Cardona's reduced-liberty status and the constitutional ramifications flowing from it effectively denies the teachings of the *Griffin* Court.

4. The capstone of Justice Scalia's majority opinion in *Griffin* was the conclusion "that the special needs of Wisconsin's probation system ma[d]e the warrant requirement impracticable" and justified the search based on "reasonable grounds," short of probable cause. *Id.* at 876, 107 S.Ct. at 3169. The instant case posits an equally great, or greater, phalanx of special needs. The imposition of a requirement that a parole officer obtain a judicial warrant whenever a suspected parole violator is to be detained would, even more so than in the probation milieu, "interfere to an appreciable degree" with the state's post-conviction monitoring of defendants. *Id.* at 876, 107 S.Ct. at 3169. Sidetracking the swift deployment of the "deterrent effect" so important in post-conviction monitoring, *see id.*, would be at least as harmful in connection with parole supervision. Similarly, if "the probation regime would ... be unduly disrupted by a requirement of probable cause," *id.* at 878, 107 S.Ct. at 3170, the dislocations would be even worse in the parole context.

Though the objectives served by parole conditions are much the same as those served by conditions of probation, *compare Morrissey*, 408 U.S. at 478, 92 S.Ct. at 2598 (describing dual purpose of parole conditions) *with Griffin*, 483 U.S. at 875, 107 S.Ct. at 3168 (describing goals of probation conditions), parole caters, by and large, to a more hardened group of offenders, punished more severely for more imposing crimes. *See Faheem–El*, 841 F.2d at 728 ("As a general proposition, parolees have been convicted of more serious crimes than individuals who receive probation."); *Burgener*, 41 Cal.3d at 533, 224 Cal.Rptr. at 131, 714 P.2d at 1269 (on the whole, parolee, as contrasted with probationer, "poses a significantly greater risk to society"). *A fortiori*, making it "more difficult for [monitoring] officials to respond quickly to evidence of misconduct," *Griffin*, 483 U.S. at 876, 107 S.Ct. at 3169, is even riskier in the parole environment. Thus, the parole system will tolerate fewer tuggings at the tightly woven fabric of regulatory constraints and must perforce receive no less consideration under the fourth amendment than the *Griffin* Court accorded to the probation system.

What is more, requiring parole officers to accompany police officers during the execution of a PVW would itself be disruptive. Parole officers in Rhode Island are neither trained nor equipped to make arrests of delinquent parolees. Common sense suggests that retaking parolees is apt to be hazardous duty. Requiring a parole officer's presence whenever a suspected violator is to be detained would create unnecessary risks and foster needless complications. *See Richardson*, 849 F.2d at 442 ("requiring the probation officer's physical presence during every probation search or requiring close supervision of all probation searches, would unnecessarily interfere with the twin goals of probation: rehabilitation of the probationer and protection of society"). Given the situational needs which permeate the disciplined precincts of parole and parole arrests, and also given the institutional realities, we believe that imposing a judicial warrant requirement in this context would, to fall back on the Court's phrase, be "impracticable." *Griffin*, 483 U.S. at 876, 107 S.Ct. at 3169.[7]

---

7. The dissent argues that in this case the police had ample time to secure an arrest warrant, rendering invalid any claim that complying with traditional fourth amendment requirements was impracticable. That viewpoint distorts *Griffin*'s "impracticability" prong. In *Griffin*, the Court inquired into the systemic impracticability of compelling those involved in implementation of a probation regime to obtain warrants. *See Griffin*, 483 U.S. at 876–77, 107 S.Ct.

To recapitulate, we are convinced that the dissent construes the imprimatur of *Griffin* too narrowly and undervalues the extent to which *Griffin* provides support for the entire institutional structure of parole. It is simply untenable to constrict *Griffin*'s focus to particular types of actors within the parole system. The concern of the *Griffin* Court with the special needs of administering a probation system was plainly a holistic concern. The reasons undergirding that concern become even more cogent in the parole environment.

In turn, the logic deriving from such holistic postulates dictates a functional approach to problems like the one currently before us. If police officers function merely as instruments of the parole system, not as law enforcers per se, they should be accorded the same privileges available to other operatives in the system. In the parole context, an arrester's identity for fourth amendment purposes should be strictly a function of his function, not of his title or usual duties. There is no constitutionally sufficient reason to deny to police officers what is permitted to parole officers when the former limit themselves to serving as functionaries within the system. To hold otherwise would both skew *Griffin*'s holistic focus and discommode the delicate arrangement of policies and concerns which underlie that focus.

## IV. CONCLUSION

We need go no further. The implications of our discussion for the case at bar are inescapable: *Griffin* governs. Given that the Rhode Island police did nothing more than implement the PVW in good faith as agents, and at the request, of duly constituted parole authorities, acting in pursuance of valid parole regulations, their entry into defendant's dwelling place, and their consequent seizure of contraband in plain view, was unexceptionable. The district court did not err in denying Cardona's

at 3169–70 (emphasizing institutional costs of forcing probation officers to comply with traditional fourth amendment criteria). The impracticability of obtaining a warrant in the particular case did not enter into the equation; indeed, Justice Blackmun argued unsuccessfully for

motion to suppress or in predicating his federal conviction on the evidence obtained from his home.

*Affirmed.*

BOWNES, Senior Circuit Judge (dissenting).

The majority believes that it "need go no further" on its "journey into fourth amendment jurisprudence" than *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). But, "[i]t is also true of journeys in the law that the place you reach depends upon the direction you are taking. And so, where one comes out on a case depends on where one goes in." *United States v. Rabinowitz*, 339 U.S. 56, 69, 70 S.Ct. 430, 436, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting). By beginning and ending its journey with *Griffin*, the majority distorts both the substance and method of fourth amendment jurisprudence. In addition, by straining to extend the *Griffin* "special needs" exception from searches by parole administrators to seizures by police officers, a situation clearly not covered, and arguably forbidden, by the language of *Griffin*, the majority ignores directly conflicting Supreme Court precedent. Because my brothers ignore basic fourth amendment principles and Supreme Court precedent, both of which we are bound to follow rather than to avoid, I must dissent.

There are at least five reasons for not following the court's incomplete fourth amendment analysis:

first, the fourth amendment has consistently been held to require probable cause for arrests;

second, Supreme Court precedent requires that police officers making an arrest at a residence must have a probable cause arrest warrant;

third, the *Griffin* "special needs" exception applies only to searches by parole officers and not arrests by police officers;

much the same sort of particularized inquiry that Judge Bownes would have us undertake. *See id.* at 885, 107 S.Ct. at 3174 (Blackmun, J., dissenting). Whether it was feasible for the police to obtain a warrant in this particular case is irrelevant for the purpose at hand.

fourth, it was not impractical for the police officers to obtain an arrest warrant; and

fifth, police officers cannot be insulated from the requirements of the Constitution by a misconceived and misapplied notion of agency.

I will consider each of these reasons in turn.

### 1. The Fourth Amendment: Arrests *always* require probable cause

I begin my analysis where the majority's journey should have begun—with the fourth amendment:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause.

The majority concedes that in most circumstances, a "reasonable" search or seizure requires a warrant and thus probable cause.[1] In certain limited situations, exceptions to the warrant and probable cause standard have been recognized for searches. But there has never been an exception to the probable cause to arrest requirement. Furthermore, unlike my brothers, I do not find any qualifications in the language of the fourth amendment based on "practicality" or "logic." Nor do I view the fourth amendment as an obstacle to be circumvented or something that can be balanced away. In my view, the fourth amendment is an unassailable constitutional command that protects the individual citizen from arbitrary police action; it cannot be adjusted on a case-by-

case basis according to judges' shifting views of practicality.

The court, while acknowledging that this case involves an arrest, the quintessential seizure, uses analysis and precedent from "search" cases rather than "seizure" cases in order to rationalize the result it wants. My brothers allude to the fact that this case does not involve a search but they do not analyze the case differently because of that fact. The case law and rationale of seizure cases differs significantly from search cases and in almost all cases requires probable cause. To ignore this distinction is to commit a grave constitutional error. When analyzed as an arrest case, neither the majority's reasoning nor result can withstand even mild scrutiny.

An arrest, the most intrusive of seizures, always requires probable cause. *See, e.g., Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (arrest at home requires probable cause arrest warrant); *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (allowing warrantless arrest based upon probable cause); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). This requirement is a long-standing one. *See, e.g., Ex Parte Burford*, 7 U.S. 269, 272 (3 Cranch 448, 453, 2 L.Ed. 495) (1806) (Marshall, C.J.) (arrest warrant illegal for lack of probable cause).

The majority's opinion establishes a new constitutional standard for arrests based on mere "reasonableness." It has cited no support for its novel view of the Constitution (because there is none) and has instead been forced to rely upon tenuous extensions of exceptions to the search provisions

---

1. It is undisputed that the PVW in this case, an administrative warrant issued on a finding of reasonable cause by the parole board, did not fulfill the probable cause requirement of the Constitution. If the police officers in this case had obtained an arrest warrant issued by a magistrate upon a showing of probable cause, this case could be resolved by a mere citation to dictum in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). An arrest warrant issued upon a showing of probable cause is sufficient to justify entry into the residence of the individual named in the warrant if the police officers have a reasonable belief that

the individual is present. *Payton*, 445 U.S. at 603, 100 S.Ct. at 1388. Once police officers are legally within a residence pursuant to a valid arrest warrant, they may seize any object within plain view that is immediately incriminating. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *United States v. Rutkowski*, 877 F.2d 139, 140–41 (1st Cir. 1989). In addition, officers may seize, incident to a lawful arrest, anything within the arrestee's immediate control in order to protect themselves or preserve evidence. *See, e.g., United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

of the fourth amendment. These exceptions are inapposite for seizure cases.

The majority adopts the methodology of search cases (case-by-case reasonableness balancing test) which also is inapplicable to arrest cases. Whatever the merits or demerits of reasonableness balancing,[2] such a method of analysis has never been applied in arrest cases. "For all but ... narrowly defined intrusions, the requisite 'balancing' has been performed in centuries of precedent and is embodied in the principle that seizures are 'reasonable' only if supported by probable cause." *Dunaway v. New York*, 442 U.S. 200, 214, 99 S.Ct. 2248, 2257, 60 L.Ed.2d 824 (1979).

2. *Payton:* Police arrests at a home require warrant

Reversal is also required on a much narrower ground: binding Supreme Court precedent on the exact issue of police officers making arrests at a suspect's home. In *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the Court held that the arrest of an individual by police officers at his home required an arrest warrant. *See also Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *United States v. Adams*, 621 F.2d 41 (1st Cir.1980); *United States v. Reed*, 572 F.2d 412 (2d Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978). That is exactly the situation presented by this case. The majority completely ignores *Payton,* the settled law that has been consistently followed and re-affirmed. *Skinner v. Railway Labor Executive Ass'n*, —— U.S. ——, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989); *Griffin*, 483 U.S. at 873, 107 S.Ct. at 3169. The Court has recently strongly reaffirmed the core of Payton stating that because of *Payton* "the police know that a warrantless entry will lead to the suppression of any evidence found inside the home." *New York v. Harris*, —— U.S. ——, ——, 110 S.Ct. 1640, 1642, 109 L.Ed.2d 13 (1990).

*Payton* was based on the clear commands of the fourth amendment. *See, e.g., United States v. Johnson*, 457 U.S. 537, 552, 102 S.Ct. 2579, 2588, 73 L.Ed.2d 202 (1982) (applying *Payton* retroactively). The "Court's own analysis in *Payton* makes it clear that its ruling rested on both long recognized principles of Fourth Amendment law and the weight of historical authority as it had appeared to the framers of the Fourth Amendment." *Johnson*, 457 U.S. at 552, 102 S.Ct. at 2589. *Payton* was also firmly buttressed by the policies underlying the fourth amendment. As the *Payton* Court stated, the "physical entry of the home is the chief evil against which the wording of the fourth amendment was directed." *Payton*, 445 U.S. at 585, 100 S.Ct. at 1379 (citation omitted); *see also Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961) ("At the very core [of the fourth amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusions"); *United States v. Curzi*, 867 F.2d 36, 41 (1st Cir.1989) (noting the special fourth amendment status of the home).

The only exception to the *Payton* rule is exigent circumstances. *Payton*, 445 U.S. at 586, 100 S.Ct. at 1380 ("seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'") (*quoting Coolidge v. New Hampshire*, 403 U.S. 443, 474–75, 91 S.Ct. 2022, 2042–43, 29 L.Ed.2d 564 (1971)). It is conceded that there were no exigent circumstances in this case.

3. *Griffin:* Administrative searches as special needs exception

The majority, ignoring *Payton*, expands the "special needs" exception applicable to administrative searches to include police

**2.** I have significant problems with the application of such a procedure to the fourth amendment but this case is not the place to explore those problems because reasonableness is clearly not applicable here. *See generally, Skinner v.*

*Railway Labor Executive Ass'n*, —— U.S. ——, 109 S.Ct. 1402, 1423–26, 103 L.Ed.2d 639 (1989) (opinion of Brennan, J.); *New Jersey v. T.L.O.*, 469 U.S. 325, 357–58, 105 S.Ct. 733, 751–52, 83 L.Ed.2d 720 (1985) (opinion of Brennan, J.).

arrests. In doing so the majority stretches "special needs" analysis beyond the breaking point; the core of fourth amendment activity, an arrest by a police officer, is now an exception to the fourth amendment probable cause requirement. The exception truly has swallowed the rule.

In creating this exception, the majority misconstrues *Griffin*. In certain administrative situations there are " 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements" in searches by administrators. *Griffin v. Wisconsin*, 483 U.S. 868, 873–74, 107 S.Ct. 3164, 3167–68, 97 L.Ed.2d 709 (1987) (*search* by probation officer); *see also O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (*search* by government employer); *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (*search* by school administrator). All of the cases cited by the majority, and all of the cases justifying special needs, involve searches by administrators in situations requiring expediency.

The arrest of Cardona is not "governed" by *Griffin* or the other special needs cases because it was not a search and was not conducted by an administrator. The Constitution and Supreme Court precedent requires probable cause for arrests, a significantly more rigorous standard than is applied to administrative searches. This standard is found throughout the history of the fourth amendment, which was written against a background of arrests based on less than probable cause. *See, e.g., Draper v. United States*, 358 U.S. 307, 314–25, 79 S.Ct. 329, 333–39, 3 L.Ed.2d 327 (1959) (Douglas, J., dissenting) (reviewing history of seizure portion of fourth amendment). In addition, an arrest, even for someone on parole, is much more intrusive of fourth amendment interests than the limited administrative searches contemplated by the "special needs" cases.

**3.** In slightly different situations, the Court has authorized administrative searches on less than traditional probable cause pursuant to a reasonable regulatory scheme. *Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981); *United States v. Biswell*, 406 U.S. 311, 92 S.Ct.

Contrary to the broad language in the majority's opinion, the "special needs" cases place great emphasis on who conducts these searches. Each of the "special needs" cases involved searches conducted by administrators because of special administrative needs.[3] Each is premised on the fact that the administrator is operating within a system that has special needs for an immediate search. None involved a search by an unaccompanied police officer; in *Griffin* the police officers were assisting the parole officers. In fact, most of the cases were premised upon the impracticability of getting the help of a police officer quickly enough. The majority has made no showing, as it must, that the special needs of the parole system required a police officer to make the arrest while at the same time requiring that officer to ignore the Constitution and *Payton*.

The importance of who is conducting the search is found in the explicit language of *Griffin* where the Court stated that it was creating an exception "beyond normal law enforcement activities." *Griffin*, 483 U.S. at 873–74, 107 S.Ct. at 3167–68. The arrest of a suspect is the epitome of law enforcement activities. *Griffin* provides no support for the proposition that police officers may ignore the constitutional requirement of a probable cause arrest warrant by using the cover of the parole department's "special needs."

The *Griffin* opinion was premised on the unique relationship between parties in the probation or parole systems which is significantly different from the adversary relationship between a citizen and a police officer. *Id.* at 876, 107 S.Ct. at 3169 ("Although a probation officer is not an impartial magistrate, neither is he a police officer who normally conducts searches against ordinary citizens. He ... is also supposed to have in mind the welfare of the probationer."). In emphasizing that special relationship, the *Griffin* Court was consistent

1593, 32 L.Ed.2d 87 (1972); *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). In each of these circumstances, the searches were conducted by administrative agents rather than police officers.

with the reasoning of other exceptions to the probable cause standard in administrative searches. But police officers are not part of the administrative scheme of the parole system. There is a significant and constitutional difference between the actions of a parole officer administering the parole system and a police officer making an arrest.[4]

Recognizing the difficulty of forcing this case within the "doctrinal orbit" of *Griffin*[5], the majority claims that all arrests are not alike. In particular they claim that Cardona is not presumptively innocent like most citizens. This is a shocking deviation from a hallowed principle of our criminal law.

### 4. *Cardona*: It was not impracticable to comply with the Constitution

The majority justifies its result by claiming that a warrant requirement would be "impracticable." It finds support for this argument in *Griffin*'s emphasis on practicality. Of course, there is no "practicality" standard in the Constitution but even if there were, it would not be applicable here. On the facts of this case, there was not a problem of practicality. There was plenty of time for the Rhode Island parole department to comply with the Constitution.

The parole officer in Rhode Island first notified New York authorities of a parole violation on January 12, 1987. After more parole violations and further investigation, a PVW was finally issued on April 21, 1987. But the police did not receive confirmation until 6:34 a.m. on May 4, 1987. This delay implies that the arrest of Cardona must not have been a very high priority for the Rhode Island parole authorities. It also shows that the parole officer had plenty of time to obtain a probable cause arrest warrant. Even after receiving the PVW, the police did not act quickly: it took two full days for the police to get around to arresting Cardona. Two days was plenty of time for the police to obtain a probable cause arrest warrant.

Moreover, "impracticality," as used by the majority, has the exact opposite meaning of its use in *Griffin* and the other special needs cases. In those cases, it was impractical to call the police because it would take too much time and the object of the search might be gone. Here the argument is that it was impractical *not* to call the police but impractical to obtain a probable cause arrest warrant. That deflates

---

**4.** I am not persuaded by the single case that the majority cites for its interpretation of *Griffin*, *United States v. Richardson*, 849 F.2d 439, 442 (9th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 171, 102 L.Ed.2d 141 (1988). Even if *Richardson* were better reasoned, it would not support the majority's view because it involved a search.

In *Richardson*, police officers suspected that an individual had committed a burglary. After determining that the suspect was on probation, the officers obtained an arrest warrant and received permission from the probation officer to search the suspect's house. The officers then went to the house and arrested the suspect who was sitting in his car in his driveway. Then they conducted a complete house search on the authority of the "permission" of the parole officer. The district court denied the motion to suppress the results of the search. A panel of the Ninth Circuit affirmed based on its reading of *Griffin*: "On balance, we believe the Court [in *Griffin*] approved the concept that the decision to authorize the search was more important than who was present when the search was made." *Richardson*, 849 F.2d at 442.

*Richardson* is strikingly at odds with cases both in the Ninth Circuit and elsewhere. Every other case I have examined that interprets *Griffin* involves the actions of parole or probation officers. I have found no other case that uses *Griffin* to support broader police activities. *See, e.g., United States v. Robinson*, 857 F.2d 1006, 1008 (5th Cir.1988). In addition to disregarding constitutional precedent, the court also failed to follow Ninth Circuit precedent. *See, e.g., United States v. Consuelo–Gonzalez*, 521 F.2d 259 (9th Cir.1975) (en banc) (prohibiting search by police pursuant to a general search condition of probation).

*Richardson* did not address squarely the constitutional issue (it treats the search and seizure issue as a question of clear error). It did not consider *Payton* or any of the Supreme Court precedents on the subject, or cases that discuss the constitutional limits of the scope of a search incident to arrest. Moreover, *Richardson* is distinguishable on the facts. No matter what other excesses the police committed, they had obtained a probable cause arrest warrant based on a parole violation warrant.

**5.** I also gratefully acknowledge that the majority recognizes the diamondlike ("adamantine" maj. op. at 67) hardness and clarity of my criticisms.

the practicality argument because if there is time to have the police do the parole department's job, there must be time to get a probable cause arrest warrant.

### 5. Police officers as agents?

In elaborating on its unique view of the Constitution, the majority justifies its position by claiming that "logic dictates ... that the fourth amendment must concern itself more with who authorizes searches and seizures ... than who implements the decisions reached." Maj. op. at 62. This sentence is puzzling. It seems initially to support my view that arrests require probable cause. The only cases that the majority can cite to bolster this proposition are those where a warrant issued by a neutral magistrate after a probable cause determination was executed by a law enforcement officer other than specified in the warrant. As those citations indicate, the Constitution requires that an independent decisionmaker (a magistrate) make a decision based upon a specified standard (probable cause). The majority, by relying on cases where a magistrate has issued a warrant, ignores the constitutional standard—probable cause— upon which the magistrate's decisions and the law enforcement officer's actions were based.

In context, this sentence indicates that the majority is not concerned with who executes a decision. I can only conclude that it is the majority's view, against the weight and history of Constitutional law, that the Constitution is concerned with ends and not means. *Cf. Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

Although the majority claims that it does not care who implements a decision, it implicitly recognizes that it must somehow relax the constitutional requirements for police officers in order to get the result it desires. The only way it can do this, avoid the full impact of the prohibitions of the fourth amendment and at the same time force the case within the *Griffin* exception is by creating an agency theory. The notion apparently is that by making the police officers agents of the parole administrators, the constitutional restrictions normally applicable to police officers do not apply. No cases are cited for this unique proposition.

If the fourth amendment does not apply to police officers, then to whom does it apply? How can police officers act as agents free of the usual constitutional restraints when they are executing the quintessential act of their job—arresting someone? The majority asserts that police officers function as "robotic" agents, not as law enforcers, but that does not change the fact that Cardona was arrested and charged with a crime rather than merely held by the police until the parole authorities took custody of him. Cardona is before us contesting the gun charge. There is no dispute that his parole should be revoked. The police "robots" clearly exceeded the scope of their agency.

Based on the majority's agency theory, I can readily envision the new exceptions that will erode the guarantees of the fourth amendment: A police officer functioning as an agent of a school principal searching students' lockers, or acting as an agent of an employer and searching desks, or even a police officer functioning as an agent of a building inspector searching everyone's basement. Such activities, easy extensions of the majority's reasoning, illustrate the danger of the agency approach.

Finally, the phrasing of the agency theory requires two brief comments. First, the language exhibits clearly the difference between our views of what is required by the Constitution. I view the Constitution as the supreme law of the land to be faithfully obeyed. The majority thinks that the commands of the Constitution "must" be contained by logic and practicality. Second, the majority's reliance on pseudoscientific language here and elsewhere in the opinion ("logic dictates," maj. op. at 64, 66; "doctrinal orbit," maj. op. at 65; "postulate," maj. op. at 66; "the logic ... from such postulates dictates," maj. op. at 69) brings to mind Justice Holmes' phrase that "the life of the law has not been logic; it has been experience." Requiring probable cause for

arrest may, at times, be neither logical nor reasonable, but it is based on the command of the Constitution as interpreted by the heavy weight of precedent. The premise of the Constitution and our criminal justice system is that the basic values embodied in the Bill of Rights are more important than simply determining factual guilt.

The court has misconstrued the Constitution and ignored Supreme Court precedent. I would follow what is the law of the land: a police officer may not make an arrest at the residence of a suspect without an arrest warrant based upon probable cause, unless there are exigent circumstances. *Payton,* 445 U.S. 573, 100 S.Ct. 1371; *United States v. Adams,* 621 F.2d 41 (1st Cir. 1980). I would reverse the district court's denial of the suppression motion. It would follow that Cardona's conviction would be reversed but, of course, that would not affect his status as a parole violator.